**Anne Moen Bullitt Biddle BREWSTER, Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 77–2010.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 23, 1979.

Decided June 1, 1979.

As Amended July 3, 1979.

Appeal from Decision of the Tax Court of the United States (U.S. Tax Court No. 7063–71).

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. § 911. Earned income from sources without the United States

(a) General rule.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:

(1) Bona fide resident of foreign country.—In the case of an individual citizen of the United States who establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except

Michael Mulroney, Washington, D. C., with whom Thomas E. Jenks, Washington, D. C., was on the brief, for appellant.

Gilbert S. Rothenberg, Atty., Dept. of Justice, Washington, D. C., with whom M. Carr Ferguson, Asst. Atty. Gen., and Gary R. Allen, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee.

Stuart E. Seigel, Atty., Internal Revenue Service, Washington, D. C., entered an appearance for appellee.

Before MacKINNON and ROBB, Circuit Judges, and RICHEY,* United States District Judge for the United States District Court for the District of Columbia.

Opinion PER CURIAM.

PER CURIAM:

A Tax Court decision upheld the Commissioner's determination that there was a deficiency in appellant's returns for the years 1962–65 and 1967–69 inclusive, and she appeals. The Commissioner based his determination upon section 911 of the Internal Revenue Code of 1954, 26 U.S.C. § 911 (1976). Section 911, which only applies to United States citizens who are *bona fide* residents of a foreign country, excludes from a taxpayer's gross income certain amounts of "earned income" attributable to personal services performed abroad. It concomitantly disallows as deductions expenses allocable to or chargeable against this earned income.[1] During the years in issue

amounts paid by the United States or any agency thereof) which constitute earned income attributable to services performed during such uninterrupted period. The amount excluded under this paragraph for any taxable year shall be computed by applying the special rules contained in subsection (c).

.        .        .        .        .

An individual shall not be allowed, as a deduction from his gross income any deductions (other than those allowed by section 151, relating to personal exemptions) or as a credit against the tax imposed by this chapter any credit for the amount of taxes paid or accrued to a foreign country or possession of the United States, to the extent that such deductions or credit is

here, appellant was a citizen of the United States and a *bona fide* resident of Ireland, where she owned and managed a farming business in which her personal services and capital were material income-producing factors. She argues that section 911 does not apply to a service-capital business that operates, as hers does at a loss. Alternatively, she contends that if section 911 does apply to her business, then the Commissioner unlawfully and arbitrarily computed the amounts of her excluded earned income and correspondingly disallowed expense deductions.[2] We hold that the principle of *stare decisis* precludes our consideration of appellant's first argument. On appellant's second contention we hold that the Tax Court correctly construed section 911's exclusion and disallowance provisions and did not clearly err in upholding the Commissioner's application of those provisions in this case. Hence we affirm.

## I

Since 1956, appellant has been the sole proprietor and active manager of a 700 acre farm in County Kildare, Ireland. Although appellant raises cattle and grows some crops on the farm, these activities are incidental to the principal object of the business, the breeding, training, and racing of horses. When she acquired the farm, appellant intended only to engage in the breeding and racing business. Subsequently poor results with outside trainers induced her to become involved in the training business as well. Appellant believed that coordinated development of breeding and training, a program fully implemented at the outset of the period in issue here, would produce a greater degree of knowledge about an individual horse's capacity, stamina, and temperament.

It is customary in Ireland for proprietors situated as appellant to employ a stud farm manager and a racing trainer to oversee, respectively, the breeding and training operations, as well as a general manager to supervise the entire business. Appellant, however, performs all three of these functions herself, personally supervising all facets of her horse farm. In her capacity as general manager, she works at the farm all day, seven days a week. She is a professionally licensed trainer. She personally directs such things as the breaking of yearlings in preparation for training and the selection of apprentices and jockeys. She regularly checks all the horses on her farm and determines such matters as when corrective shoeing is necessary and when treatment of foals is required. She also does her own secretarial work and directs payments of all expenses.

To assist her on the farm, appellant employs approximately forty-five to fifty per-

---

properly allocable to or chargeable against amounts excluded from gross income under this subsection.

(b) Definition of earned income.—For the purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income.

26 U.S.C. § 911 (1976).

**2.** Appellant also urges us to allow her to elect the income-averaging provisions of 26 U.S.C. § 1301. Our review of the record yields no indication that appellant raised this point below. Accordingly, we decline appellant's invitation to probe the availability of section 1301. *Cf. Doe v. McMillan,* 148 U.S.App.D.C. 280, 287 n. 10, 459 F.2d 1304, 1311 n. 10 (1972), *rev'd in part on other grounds,* 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); *Miller v. Avirom,* 127 U.S.App.D.C. 367, 369, 384 F.2d 319, 321 (1968). We do not intend, however, to attach *res judicata* effects to this issue so as to preclude the Commissioner, in the interests of complete justice, from examining this question, and if appellant's position is sound, from granting appropriate relief. *Cf. Glowinski v. Commissioner of Internal Revenue,* 100 U.S.App. D.C. 212, 243 F.2d 635 (1957); n. 5 *infra.*

sons. Among these are an accountant, who handles all the books and also supervises the cattle-grazing and crop-growing operations; a stud groom, who acts as foreman of the breeding operation and as its manager in appellant's absence; and a head lad, who is the stud groom's counterpart in the training operation. Appellant operates her farm as a proprietorship; she does not pay herself a salary.

On her federal tax returns for the years in question, appellant reported all her gross farm income and deducted all her gross farm expenses. The gross farm income, representing the ordinary income from the conduct of appellant's farm, consisted of income from the sale of cattle and manure, horse boarding fees, and net race winnings. It did not include income appellant realized from the sale of horses, which income appellant separately reported as long-term capital gain. Appellant's gross farm expenses, representing the ordinary expenses associated with the realization of ordinary income, consisted of wages and social insurance for her employees; feed for horses; grass seed for pastures; depreciation not recaptured from the sale of horses; general supplies; repairs; fertilizers; stud fees and boarding expenses of brood mares at other farms; veterinary and other medical expenses; costs associated with operating machinery; insurance; bank interest and charges; electricity and telephone; rent; local taxes; carriage and freight for transporting horses; motor car expenses; horseshoeing; costs attributable to training horses at other training farms; straw and peat moss; management fees; saddlery; periodicals dealing with horse breeding, training, and racing; stationery and postage; gratuities to employees; travel and entertainment; subscription and entry fees for registration of horses in the stud book; tools and short-life equipment; advertising; commissions and fees associated with the sale of cattle; legal expenses; rental of special machinery; and fees associated with horse races. Appellant did not include in her gross farm expenses those expenses associated with the sale of horses, such as the commissions and fees related to those sales. Appellant correctly excluded from her gross farm expenses those expenses attributable to her personal activities.

In each of the relevant tax years, appellant's gross farm expenses exceeded her gross farm income, resulting in a net farm loss. On appellant's returns these losses were used to offset United States-source income and foreign capital gains included in taxable income. On the theory that section 911 did not apply to service-capital business that operated at a loss, appellant did not exclude her foreign (section 911) earned income from her gross income with the attendant disallowance of expense deductions.

Upon audit, the Commissioner determined that 30% of appellant's gross farm income was compensation for her personal services on the farm, and therefore should have been excluded from her gross income as income earned abroad within the meaning of section 911. Likewise, the Commissioner determined that 30% of appellant's gross farm expenses was allocable to and chargeable against this excluded earned income, and therefore should not have been deducted. These determinations reduced by 30% appellant's net farm loss in all but one of the tax years in question.[3] Based on this reduction in offsetting losses, the Commissioner calculated a deficiency in appellant's tax payments totalling in excess of $188,-000. The Tax Court upheld the Commissioner. *Brewster v. Commissioner of Internal Revenue*, 67 T.C. 352 (1976). This appeal followed.

## II

Appellant's first and principal contention is that section 911 has no application to a service-capital business that is operated at a loss. This is appellant's second visit to this

---

**3.** For the year 1963, 30% of appellant's gross farm income exceeded the then applicable dollar limitation of $35,000 for the earned income exclusion. *See* 26 U.S.C. § 911(b) (1958 ed. Supp. IV). In consequence, the disallowance of gross farm expenses for that year was also proportionately reduced.

court in quest of a holding to that effect. In the first proceeding, *Brewster v. Commissioner of Internal Revenue*, 154 U.S. App.D.C. 30, 473 F.2d 160 (1972) *("Brewster I"), aff'g per curiam*, 55 T.C. 251 (1970), appellant raised precisely the same question and offered basically the same analysis that she poses here. In *Brewster I*, which involved earlier years, the Commissioner and appellant had stipulated that appellant's capital and personal services were material income-producing factors in her business. Subsection (b) of section 911 limits excludable earned income from service-capital businesses to a reasonable allowance that is not to exceed 30% of the net profits from such a business. Appellant asserted that this provision—in particular, the 30% limit on earned income—displayed a congressional intent to confine application of section 911 to service-capital businesses that operate at a profit. She reasoned that excluding earned income derived from a business that operated at a loss would frustrate section 911's goal of benefiting taxpayers who live and work abroad. The Commissioner responded that Congress designed subsection (b) as an administrative convenience to alleviate the difficulties inherent in computing the appropriate allowance for personal services in a business in which both capital and services materially contributed to the production of income. He maintained that it had no relevance to a situation in which the losses from a service-capital business exceeded income.

We agreed with the Commissioner. Emphasizing the language of the statute, we wrote that "[t]he apparent anomaly of 'earned income' from a business operated at a loss is ascribable to the fact that the statutory concept of 'earned income' in § 911 is structured in terms of gross income rather than net profits." *Id.* 154 U.S.App. D.C. at 32, 473 F.2d at 162. We pointed out that the preface of section 911 does not mention profits or losses, but instead provides that "[t]he following items [*i. e.*, earned income] shall not be included in *gross income*," 26 U.S.C. § 911(a) (1976) (emphasis added). Although aware that the exclusions and limitations in section 911

engendered "certain incongruities" in particular circumstances, we observed that the Commissioner's reading of the statute does not transgress its basic rationale, which we described as an effort "to permit American business men [*sic*] to compete abroad with foreign entrepreneurs, without being subject to double taxation possibilities." 154 U.S.App.D.C. at 33, 473 F.2d at 163. We also noted that in the vast majority of situations section 911 does indeed benefit the taxpayer living and working in a foreign country. In effect, avoiding appellant's misguided mingling of the concepts of "earned" and "taxable" income, we found no statutory barrier to a determination that a taxpayer could earn income from personal services despite the fact that the income derived from a business that lost money.

Our holding in *Brewster I* disposes of appellant's first contention because the important principle of *stare decisis* requires that result. *Stare decisis* compels adherence to a prior factually indistinguishable decision of a controlling court. *E. g., Braniff Airways, Inc. v. Civil Aeronautics Board*, 189 U.S.App.D.C. 68, 70–71, 581 F.2d 846, 848–49 (1978); *see* 1B *Moore's Federal Practice* ¶ 0.402[1] (2d ed. J. Moore & T. Currier 1974). This principle assumes increased importance when the antecedent case involves construction of a statute. *See* 1B *Moore's Federal Practice, supra* ¶ 0.402[5]. In its intra-circuit application, *stare decisis* demands that we abide by a recent decision of one panel of this court unless the panel has withdrawn the opinion or the court *en banc* has overruled it. *See, e. g., United States v. Caldwell*, 148 U.S. App.D.C. 20, 26 & n. 19, 543 F.2d 1333, 1339 & n. 19 (1974), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); *United States v. Bryant*, 153 U.S.App.D.C. 72, 78, 471 F.2d 1040, 1046 (1972) (per curiam), *cert. denied*, 409 U.S. 1112, 93 S.Ct. 923, 34 L.Ed.2d 693 (1973). This principle encourages uniformity in the application of legal standards, enhances predictability in decisionmaking, promotes the interests of judicial efficiency and economy, and evinces respect for the efforts of earlier courts that

have struggled to educe the appropriate legal norms.

Since our opinion in *Brewster I* no justifying legal changes have arisen to require a different result in this case. We do not reach this conclusion by any rigid or mechanical application of the principle of *stare decisis*. Since 1973, the date of that decision, Congress has made no changes in the text of section 911 that are relevant to this discussion. Nor has this court or the Supreme Court issued any decision that in any way erodes the force of *Brewster I*. Appellant offers no cogent basis favoring departure from our earlier disposition. The only subsequent decision to which she refers, *Vogt v. United States*, 537 F.2d 405, 210 Ct.Cl. 246 (1976), involved an entirely different issue from the one presented in *Brewster I* and the Court of Claims explicitly and carefully distinguished our decision, see *id.* at 415.[4] Thus, even were a contrary Court of Claims decision sufficient to relieve us of our obligation to follow a recent and well-considered decision of this court, we would find *Vogt* of only marginal value in a *de novo* analysis of this case.

Appellant insists that *Brewster I* is factually distinguishable from the instant proceeding because there the parties stipulated to the reasonableness of the amounts the Commissioner excluded from earned income and disallowed as deductions whereas here appellant contests those amounts. This argument misconceives the scope of the narrow issue decided in *Brewster I*. The sole question before that court was whether section 911 covered a service-capital business that operated at a loss. The only facts germane to that issue were that appellant's personal services and capital had been material income-producing factors in her business and that her business indeed operated at a loss. Those facts are no more disputed here than they were there. We acknowledged that bizarre results might accompany application of section 911 in certain circumstances, but we did not condition our holding that section 911 applies to service-capital businesses that operate at a loss on the reasonableness of the Commissioner's determinations on excludable earned income from year to year and from taxpayer to taxpayer. The question of reasonableness is a separate inquiry, one in which *Brewster I* did not engage. Accordingly, on the issue of section 911 coverage, *Brewster I* controls this case.[5]

### III

Anticipating our adherence to *Brewster I*, appellant alternatively complains that the Commissioner's determinations of the income she "earned" and of the expenses attributable to it are inconsistent with the statute and otherwise arbitrary and capricious. Courts play a restricted role in cases of this kind. Although our interpretation of the appropriate legal standards is bridled only by the deference due the Commissioner in certain circumstances, see *Commissioner of Internal Revenue v. Stidger*, 386 U.S. 287, 296, 87 S.Ct. 1065, 18 L.Ed.2d 53 (1967); *Nico v. Commissioner of Internal Revenue*, 565 F.2d 1234, 1237 (2d Cir. 1977), our review of the Commissioner's and the Tax Court's application of the appropriate standards to a particular set of facts is considerably more restrained. A presumption of correctness accompanies a determination by the Commissioner. *Rockwell v. Commissioner of Internal Revenue*, 512 F.2d 882,

---

4. *Vogt* involved the question whether the Commission could apply the maximum dollar amount on excluded earned income to the taxpayer's share of the partnership's gross income. The Court of Claims, carefully noting that the question pertained only to the partnership setting, held that the Commissioner could not, and that instead the limit had to be applied to the taxpayer's share of the partnership's net income. 537 F.2d at 415. The court's rationale rested upon considerations peculiar to the tax status of partnerships. *See id.* at 410–15.

5. Owing to our view that the principle of *stare decisis* controls, we need not consider whether *Brewster I* also collaterally estops appellant from relitigating the issue of section 911 coverage. The rules of collateral estoppel apply to tax proceedings exclusively involving issues of law, see *Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 598–599, 68 S.Ct. 715, 92 L.Ed. 898 (1948), but they are to be sparingly used, *see id.* at 600; 1B Moore's Federal Practice ¶ 0.442[3] (2d ed. 1974).

885 (9th Cir.), *cert. denied*, 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975); *Plisco v. United States*, 113 U.S.App.D.C. 177, 179 n. 2, 306 F.2d 784, 786 n. 2 (1962). This places the burden of proceeding on the taxpayer, *see* 9 J. Mertens, *The Law of Federal Income Taxation* § 50.61 (J. Doheny ed. 1977), and thereafter the burden of persuasion rests with the taxpayer. *Helvering v. Taylor*, 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623 (1935). That is, the taxpayer must show by a preponderance of the evidence that the Commissioner's determination is in error. *See Burnet v. Niagara Brewing Co.*, 282 U.S. 648, 654, 51 S.Ct. 262, 75 L.Ed. 594 (1931); *Valley Title Co. v. Commissioner of Internal Revenue*, 559 F.2d 1139, 1141 (9th Cir. 1977); J. Mertens, *supra* § 50.62. If the Tax Court resolves facts in favor of the Commissioner or holds that the taxpayer has failed to meet that burden, then we must uphold the Tax Court unless its findings are clearly erroneous. *Farcasanu v. Commissioner of Internal Revenue*, 140 U.S. App.D.C. 398, 401, 436 F.2d 146, 149 (1970) (per curiam).

### A

Section 911 provides that the Commissioner shall consider as earned income "a reasonable allowance as compensation for the personal services rendered by the taxpayer." 26 U.S.C. § 911(b) (1976). As we noted above, the Commissioner here found that 30% of appellant's gross farm income, which did not include gains from the sale of horses, constituted compensation for appellant's personal services on her farm. The Tax Court held that, while the Commissioner could not mechanically apply the 30% figure in every case, the appellant had failed to show that this assessment was unreasonable as applied to her. Appellant challenges this holding on two grounds. First, she argues, the Tax Court used the wrong test to determine whether she had in fact met her burden. She maintains that the Tax Court should have resorted to section 162(a)(1) of the Code for guidance in computing compensation under section 911. Second, she contends that no matter how the Commissioner computes earned income,

he must include the gains she derived from the sale of horses in the base gross income figure. She maintains that these gains were an integral part of her farm income.

Section 162(a)(1) of the Code allows taxpayers to deduct as an ordinary and necessary business expense "a reasonable allowance for salaries or other compensation for personal services actually rendered." 26 U.S.C. § 162(a)(1) (1976). Noting the similarity between this language and that in section 911, appellant by way of analogy offered at trial evidence of the sums she would have had to pay replacement employees to perform the services appellant herself performed. These sums, appellant argues, are the proper measure of the compensation for the services she actually rendered in generating gross farm income. Appellant asserts that the Commissioner's alternative computation is an arbitrary figure, intimating that the Commissioner borrowed the figure from subsection (b)'s limitation on the amount of net profits a taxpayer can exclude as compensation from gross income.

■ We endorse the Tax Court's view that the statute neither requires nor permits the Commissioner, as a matter of administrative convenience or otherwise, to transform the reasonableness standard into a fixed 30% figure. The theory of *Brewster I* forecloses use of subsection (b)'s limitation to accomplish that result. The language of section 911 requires a case-by-case assessment of the income from a service-capital business that is reasonably attributable to the taxpayer's personal services. At the same time, however, we share the Tax Court's skepticism about the pertinence of a section 162 inquiry in the context of section 911. When a court confronts two different sections of the Code, each serving a different purpose and each having its own legislative background, it must hesitate in the absence of a clear congressional mandate before importing the incidents of one into the other. *Grunebaum v. Commissioner of Internal Revenue*, 420 F.2d 332, 335 (2d Cir.), *cert. denied*, 397 U.S. 1075, 90 S.Ct.

1523, 25 L.Ed.2d 810 (1970). The considerations appropriate to a determination of reasonableness under section 162 are many and variegated, *see* 4A J. Mertens, *supra* § 25.-69, and not all of those factors are helpful in a situation in which the Commissioner must impute reasonable compensation where no compensation has actually been paid. No doubt some of the elements of a section 162 inquiry are useful in computing a reasonable allowance under section 911, but the latter provision may impose a more complex burden on the taxpayer to show that portion of the taxpayer's gross receipts that ought to be attributed to personal services rather than to capital.

Appellant's evidence on how much she would have had to pay replacement employees does not directly address the crucial question of the contribution *appellant's* services made to the production of gross farm income. She offered no evidence on the value of her services apart from the testimony on how long and hard she worked. Appellant was the proprietor and active manager of a business that operated at a loss, yet the cost-of-replacement evidence appellant offered does not reflect her status as proprietor or the fact that her business lost money. It belies common sense to assert that the services of an employee are fully comparable to the owner of a business who finances and manages the enterprise in addition to performing tasks employees would normally carry out. Using the compensation that would have been paid to replacement employees makes no allowance for the degree of the business' profitability or lack of profitability, a factor that is always relevant to consideration of the reasonableness of the compensation. It also assumes that appellant would have been willing to hire such replacement employees despite the existence of continual losses in her business. Moreover, as the Tax Court noted, appellant's evidence does not permit consideration of the work now done by appellant's employees that would have been done by replacements and which lessened the extent of the work demanded of appellant. In light of these factors, we cannot say that the Tax Court clearly erred in upholding the Commissioner's determination.

Similarly, we are unpersuaded by appellant's claim that her gross farm income must include receipts she realized from the sale of horses for the purpose of computing the earned income exclusion. Appellant's task below was to show that the amount the Commissioner excluded as compensation was unreasonable. In determining whether appellant had met her burden, the Tax Court properly focused on the excluded amount rather than the base from which it was computed. As we have said, there is nothing magical about the 30% figure the Commissioner used. The Commissioner might have used a different figure, and it might have varied from year to year. The only requirement is that the resulting excluded earned income be reasonable. Hence there is no guarantee that the inclusion of horse sale receipts in the gross farm income would have materially affected the amount of excluded earned income. Moreover, appellant stipulated that she was in the business of breeding, training, and racing horses; her occasional sale of horses was incidental to that concern. Accordingly, on her tax returns, appellant excluded from her gross farm income the proceeds she received from the sale of horses and separately reported those proceeds to obtain favorable capital gains treatment. Styling those proceeds as part of her gross farm income for section 911 purposes would at least raise doubts about her entitlement to capital gains treatment under section 1231 of the Code. *See* 26 U.S.C. 1231 (1976).

### B

Section 911 provides that the taxpayer shall not be allowed as a deduction from gross income any deductions "properly allocable to or chargeable against amounts excluded from gross income." 26 U.S.C. § 911(a) (1976). As we noted above, the Commissioner found that 30% of appellant's gross farm expenses, which did not include expenses directly associated with the sale of

horses, were allocable to or chargeable against appellant's earned income. The Tax Court, while again correctly warning that the 30% figure could not be mechanically applied, held that the Commissioner had acted lawfully. Appellant challenges this holding on four grounds. First she argues that only those expenses that replacement employees would have incurred should be subject to disallowance. This contention is no more persuasive on the expense side than it was on the income side, and thus we find it unnecessary to discuss it further.[6] Second she maintains that the statutory phrase "allocable to or chargeable against" requires that only those expenses be disallowed which are specifically identified with earned income. Third she insists that the amount of disallowed deductions cannot in any event exceed the amount of excluded earned income. Finally she contends that her gross farm expenses, the base from which the Commissioner determined the 30% figure, should have been reduced by excluding a portion of her ordinary farm expenses that could be attributed to her sale of horses.

■ Appellant's suggested item-by-item approach to section 911's disallowance provision hinges in part on her assertion that disallowed expenses must be specifically service-related rather than capital-related and in part on her contention that the words "allocable to" exhibit a congressional intent to confine disallowed expenses to those with a definite factual relationship to earned income. It may be that in some service-capital businesses the expenses related to capital and those related to personal services can be neatly cleaved in two. In appellant's business, however, it was an alli-

ance of capital and personal services that combined to produce gross income. The purpose of section 911's disallowance provision is to ensure that the income excluded as "earned" remain burdened with the costs associated with its production. Section 911 identifies the disallowed expenses with the "amounts excluded from gross income" rather than with the rendition of personal services *per se*. This parallels the statute's language on the income side, which avoids conditioning a determination of earned income upon a finding that a particular item of gross income is identified with services rendered. A persistent failure to incur any one of the farm expenses we listed above would result in a gradual diminution of appellant's gross receipts. There exists, then, a direct relationship between these expenses and the income appellant "earned." This relationship is all that the statute requires. It follows that we are unconvinced by appellant's attempt to circumvent the symmetry in section 911 by attaching controlling significance to the words "allocable to." Appellant's claim that Congress would have used the word "apportioned" had it contemplated use of a comparable ratio on the income and deduction sides has no support in either the language of the statute or its legislative history, and could lead to a situation in which a taxpayer's tax loss could exceed his actual loss.[7]

■ Appellant's contention that the amount of disallowed deductions can never exceed the amount of excluded earned income similarly lacks a foundation in either the language or the history of section 911. As the Tax Court pointed out, appellant's suggestion would also render our decision in

---

6. Appellant claimed in the Tax Court that because replacement employees would have incurred none of the expenses claimed by the appellant as the proprietor of a service-capital business, the excluded income should not be charged with any expenses. As the Tax Court noted, this approach, which would exclude income without a necessary disallowance of expenses, could produce a tax loss in excess of actual loss unless the replacement employee expenses were at least as great as the excluded earned income.

7. *Cf.* n. 6 *supra*. The Tax Court's example is useful:

Assume total gross income of $1,000, expenses of $1,500, of which only $100 are clearly identified with earned income. On the basis of a 30-percent exclusion from gross income, the taxpayer would report $700 of gross income and, under [appellant's] theory, would be entitled to deduct $1,400. This produces a tax loss of $700, although the actual loss is only $500.

67 T.C. at 364 n. 17.

*Brewster I* an academic exercise, for if the taxpayer reduced both the income and deduction sides by the same amount, the result would produce the same net loss as if section 911 had never been applied. That is why the *Brewster I* court, in dicta, expressly rejected this position. *See,* 154 U.S.App. D.C. at 34 n. 6, 473 F.2d at 164 n. 6. We refuse to do *sub rosa* what we earlier declined to do explicitly, *see* Part II *supra,* and accordingly we hold that section 911 does not forbid the disallowance of deductions in excess of the amount of income excluded as compensation from gross income.

■ Finally appellant poses the reflected image of her contention that receipts from her sale of horses ought to be included in her gross farm income for section 911 purposes. Appellant maintains that a portion of her gross farm expenses are properly allocable to the proceeds she received from selling horses, and therefore, if those proceeds are not to be included in the gross farm income figure, that such expenses should be excluded from her gross farm expenses for the purpose of computing the disallowance. The Tax Court correctly rejected this contention. The gross farm expenses appellant incurred reflect the ordinary costs of maintaining a farm for the breeding, training, and racing of horses. Appellant did not hold her horses for sale in the ordinary course of business and hence none of her ordinary expenses can be attributed to horse sales. In invoking the advantages of capital gains tax treatment on her sale of horses, appellant offset a portion of her horse sale proceeds with the expenses directly associated with those sales. *See* Part I *supra.* The statute does not entitle appellant further to offset her capital gain income by increasing in this manner the amount of the expenses she may deduct.

### IV

*Brewster I* binds this court to a holding that section 911 applies to service-capital businesses operating at a loss. Appellant has failed to show that the Commissioner misconstrued that provision or that the Tax Court clearly erred in upholding the Commissioner's determinations thereunder. Accordingly, the decision of the Tax Court is

*Affirmed.*