Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 21, 2003      Decided April 15, 2003

No. 02-5041

NATIONAL MINING ASSOCIATION,
APPELLANT

v.

JOHN M. FOWLER, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 00cv00288)

———

*Catherine E. Stetson* argued the cause for appellant. With her on the briefs were *George W. Miller* and *Harold P. Quinn Jr.*

*Mark R. Haag*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Roscoe C. Howard Jr.*, U.S. Attorney, *Javier Marques*, Associate General Counsel, Advisory Council on Historic Preser-

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

vation, *R. Craig Lawrence* and *Daria J. Zane*, Assistant U.S. Attorneys.

Before: TATEL and GARLAND, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: The Advisory Council on Historic Preservation, an independent federal agency, is authorized by its organic statute to promulgate regulations ensuring that federally funded or federally licensed undertakings incorporate historic preservation values at the planning stage. Responding to Congress's expansion of the definition of "undertaking," the Council extended its regulation to projects licensed or permitted by state and local agencies "pursuant to a delegation or approval by a Federal agency." 36 C.F.R. § 800.16(y). Because this circuit has held that Congress's expanded definition of "undertaking" does not alter the statutory requirement that the Council regulate only *federally funded* or *federally licensed* undertakings," *Sheridan Kalorama Historical Ass'n v. Christopher*, 49 F.3d 750, 755 (D.C. Cir. 1995) (emphases in original), we reverse the district court's decision to the contrary and remand the case for further proceedings consistent with this opinion.

## I.

The National Historic Preservation Act, 16 U.S.C. § 470 *et seq.*, "requires each federal agency to take responsibility for the impact that its activities may have upon historic resources, and establishes the Advisory Council on Historic Preservation . . . to administer the Act." *City of Grapevine v. Dep't of Transp.*, 17 F.3d 1502, 1508 (D.C. Cir. 1994). NHPA section 106 states:

> The head of any Federal agency having direct or indirect jurisdiction over a proposed *Federal or federally assisted* undertaking in any State and the head of any Federal department or independent agency having authority to *license* any undertaking shall, prior to the approval of the expenditure of any

> *Federal funds* on the undertaking or prior to the issuance of any *license*, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking.

16 U.S.C. § 470f (emphases added). An "essentially . . . procedural statute," *City of Alexandria v. Slater*, 198 F.3d 862, 871 (D.C. Cir. 1999), section 106 imposes no substantive standards on agencies, but it does require them to solicit the Council's comments and to "take into account the effect of [their] undertaking[s]." Section 211 adds that the Council may "promulgate such rules and regulations as it deems necessary to govern the implementation of [section 106] in its entirety." 16 U.S.C. § 470s.

This case involves a dispute over which projects trigger section 106's procedural requirements: (1) all statutory "undertakings" or (2) only "undertakings" that are "Federal or federally assisted" or licensed by a "Federal department or independent agency." Before 1992, this was a distinction without a difference, since section 301—the NHPA's definitional section—defined "undertaking" as "any action as described in [section 106]." 16 U.S.C. § 470w(7) (1988). In 1992, however, Congress amended section 301, replacing its cross-reference to section 106 with a specific definition:

> "Undertaking" means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including—
>
> (A) those carried out by or on behalf of the agency;
>
> (B) those carried out with Federal financial assistance;
>
> (C) those requiring a Federal permit[,] license, or approval; and

(D) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.

16 U.S.C. § 470w(7).

In 2000, following a seven-year rulemaking process, the Council promulgated a regulation (now codified at 36 C.F.R. § 800.1 *et seq.*) which "implemented the 1992 amendments to the . . . NHPA," 65 Fed. Reg. 77,698, 77,698 (Dec. 12, 2000), in order to "define how Federal agencies meet the[ir] statutory responsibilities" under section 106, 36 C.F.R. § 800.1(a). In a provision entitled "Initiation of the section 106 process," the Council's regulation specifies that agencies must first "determine whether the proposed Federal action is an undertaking as defined in § 800.16(y)." *Id.* § 800.3(a). In turn, section 800.16(y) defines "undertaking" in language virtually identical to NHPA section 301's, including its reference to undertakings "subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency." The regulation goes on to establish a series of procedures—e.g., consultation with the Council, state historical preservation officers, and the public—with which agencies must comply if their actions qualify as "undertakings" with potential to affect historic properties. *See* 36 C.F.R. §§ 800.3–800.7.

Appellant National Mining Association (NMA), a non-profit trade organization, filed suit in the United States District Court for the District of Columbia, charging the Council with exceeding its statutory authority to promulgate regulations "govern[ing] the implementation" of section 106. 16 U.S.C. § 470s. The NMA alleged that sections 800.3(a) and 800.16(y) of the regulation exceed the Council's statutory authority because they attach procedural requirements to undertakings "subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency," even though such undertakings are neither funded nor licensed by the federal government as required by NHPA section 106. The NMA is concerned that the Council's regulation applies to state and local agencies that issue permits under so-called cooperative federalism statutes such as the

Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. § 1201 *et seq.*, the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* For example, although the NMA concedes that "[t]he federal government's approval of a State's *overall* SMCRA permitting program may arguably be an action subject to Section 106, because the federal government contributes funds to the general administration of state permitting programs and approves those programs," it contends that individual state mining permits do not fall within that section since "the federal government does not retain the authority to approve or reject any one mining project application." Appellant's Br. at 31 n.10 (emphasis in original).

On cross-motions for summary judgment, the district court rejected the NMA's argument that the Council lacks statutory authority to regulate state and local permitting agencies, holding that "section 106 applie[s] to the full range of undertakings defined in [section 301]." *Nat'l Mining Ass'n v. Slater*, 167 F. Supp. 2d 265, 290 (D.D.C. 2001); *see also Nat'l Mining Ass'n v. Slater*, No. 00-00288, mem. op. at 3-6 (D.D.C. Nov. 28, 2001) (denying the NMA's motion to alter or amend the court's previous opinion). The NMA appeals. We review the district court's grant of summary judgment for the Council de novo. *Troy Corp. v. Browner*, 120 F.3d 277, 281 (D.C. Cir. 1997).

## II.

Before addressing the merits of the NMA's claim, we must consider the Council's argument that the NMA's "concerns are too speculative and abstract to warrant review at this time." Appellees' Br. at 11. The district court rejected this argument, as do we.

"The framework for analyzing the ripeness of pre-enforcement agency action is well established. . . . [W]e must consider 'both the fitness of the issue[ ] for judicial decision and the hardship to the parties of withholding court consideration.' " *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 434 (D.C. Cir. 1986) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149

(1967) (second alteration in original)). Within this framework, "[i]f we have doubts about the fitness of the issue for judicial resolution, then we balance the institutional interests in postponing review against the hardship to the parties that will result from delay. Where, however, there are no significant agency or judicial interests militating in favor of delay, [lack of] hardship cannot tip the balance against judicial review." *Consol. Rail Corp. v. United States*, 896 F.2d 574, 577 (D.C. Cir. 1990) (internal quotation marks and citation omitted) (addition in original).

Beginning with fitness, "we ask first whether the issue raised in the petition for review presents a purely legal question, in which case it is presumptively reviewable." *Am. Petroleum Inst. v. EPA,* 906 F.2d 729, 739 (D.C. Cir. 1990) (internal quotation marks and citation omitted). Answering this question is easy: Because the NMA's challenge requires us to resolve the relationship between the NHPA's definitional and operational provisions, we face a purely legal issue. The Council does not argue otherwise.

We next "consider whether the agency or court will benefit from deferring review until the agency's policies have crystallized through the application of the policy to particular facts." *Id.* (internal quotation marks and citation omitted). Putting the point somewhat differently, we must decide "whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Her Majesty the Queen ex rel. Ontario v. EPA*, 912 F.2d 1525, 1532 (D.C. Cir. 1990). The Council argues that the NMA's claim fails at this second stage of the fitness inquiry. According to the Council, by instructing agencies to "determine whether the proposed *Federal* action is an undertaking as defined in § 800.16(y)," 36 C.F.R. § 800.3(a) (emphasis added), the regulation leaves room for individual agencies to decide whether the term "*Federal* action"—defined in neither the regulation nor the statute—limits the regulation's application to a subset of section 301 "undertakings." Appellees' Br. at 30. This case is unripe, the Council argues, because the term "Federal action" introduces enough ambiguity into 36 C.F.R. § 800.3 that the Council cannot itself say what the

regulation means and to whom it applies until "various federal, state and local officials" actually apply it. Appellees' Br. at 16. For two reasons, we are unpersuaded.

First, even though the Council is surely correct that 36 C.F.R. § 800.3 is not a model of clarity, we see no reason to postpone the purely legal task of interpreting the ambiguous regulation until the "various federal, state and local officials" have interpreted it first, especially since those officials would receive no deference in interpreting either the NHPA or the Council's regulation. *See Nat'l Treasury Employees Union v. Fed. Labor Relations Auth.*, 848 F.2d 1273, 1275 (D.C. Cir. 1988) ("Although we must give considerable deference to [an agency's] construction of its enabling statute, . . . we need not defer to its interpretation of other statutes . . . or to its construction of regulations promulgated by other agencies . . . ." (internal citations omitted)). The ripeness doctrine, by focusing on whether "the agency's policies have crystallized," *Am. Petroleum Inst.*, 906 F.2d at 739 (internal quotation marks and citation omitted), and on whether "the agency's action is sufficiently final," *Her Majesty the Queen*, 912 F.2d at 1532, protects agency ability to "deliberate and craft policy free of judicial interference," *Ciba-Geigy*, 801 F.2d at 434. In this case, the agency whose deliberative freedom enjoys protection by the ripeness doctrine is the Council, for it is the Council to whom Congress gave regulation-writing authority, and it is the Council's interpretation of its own regulation that "command[s] substantial judicial deference." *McMillan Park Comm. v. Nat'l Capital Planning Comm'n*, 968 F.2d 1283, 1288 (D.C. Cir. 1992). The Council cites no authority, nor are we aware of any, for the proposition that the need to preserve breathing room for policymaking agencies also extends to entities—including, according to the Council, even state and local agencies—responsible for mechanically implementing policymaking agencies' regulations.

Second, the Council has retreated from its position, asserted in its brief, that 36 C.F.R. § 800.3's scope has not yet been crystallized. Pressed at oral argument, the Department of Justice attorney representing the Council, after consulting

with the agency's attorney, informed us that the Council intends its regulation to implicate all section 301 "undertakings," notwithstanding 36 C.F.R. § 800.3's apparently toothless reference to "Federal action." Moreover, the record contains evidence that a key agency has already interpreted the Council's regulation in just this way. A March 2000 letter from the Office of Surface Mining Reclamation and Enforcement of the U.S. Department of the Interior to a state permitting agency explains that the NHPA "makes clear that State permitting actions and related activities under the Surface Mining Control and Reclamation Act (SMCRA) are subject to section 106 review and consultation requirements." Though the regulation challenged here was not yet issued when the Office of Surface Mining wrote this letter, the letter notes that the agency reached its interpretation in light of a regulation the Council promulgated in 1999—a regulation that is substantively identical to the one at issue here.

This acknowledged applicability of the Council's regulations to state and local agencies that operate "pursuant to a delegation or approval by a Federal agency" distinguishes this case from *Clean Air Implementation Project v. EPA*, 150 F.3d 1200 (D.C. Cir. 1998), upon which the Council relies. There, the Environmental Protection Agency had changed the acceptable testing methods for measuring compliance with the Clean Air Act's pollution standards. Petitioners claimed—and the EPA denied—that changing the testing methods amounted to "changing the standard[s] themselves." *Id.* at 1203. Lacking the evidence necessary to decide whether altering permissible testing methods had in fact changed the EPA's underlying CAA standards, we concluded that "[a]s matters now stand, there are too many imponderables," and declined to decide whether the alleged change in standards was unlawful. *Id.* at 1205. Here, by contrast, no threshold factual issues counsel postponing judgment. All disputed issues are purely legal, as the Council itself concedes, and given its representation at oral argument and the Office of Surface Mining's letter, there are no imponderables.

### III.

Turning to the merits of the NMA's contention that the Council exceeded its statutory authority, we start, as always, by asking whether Congress has spoken to "the precise question at issue." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842 (1984). If it has, both we and the agency must give effect to Congress's unambiguously expressed intent. *Id.* at 842–43. Only if we find the statute either silent or ambiguous with respect to "the precise question at issue" do we proceed to *Chevron*'s second step, asking "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 842–44.

In this case, our analysis begins and ends at *Chevron* step one. NHPA section 211 unambiguously limits the Council to promulgating regulations that "govern the implementation of [section 106]." 16 U.S.C. § 470s. Not arguing otherwise, the Council contends that 36 C.F.R. § 800.3 lawfully implements section 106 because "the section 106 process applies to the full range of undertakings defined in section 301." Appellees' Br. at 23. That argument, however, is barred by *Sheridan Kalorama Historical Association v. Christopher*, 49 F.3d 750 (D.C. Cir. 1995), which squarely holds that Congress's 1992 broadening of section 301 did not override section 106's requirement that the project be federally funded or licensed.

*Sheridan Kalorama* involved the Secretary of State's decision not to exercise his veto power under the Foreign Missions Act, 22 U.S.C. § 4301 *et seq.*, to halt the Republic of Turkey's plans to demolish its chancery. The Sheridan Kalorama Historical Association and others filed suit, alleging that NHPA section 106 required the Secretary to solicit Council comments on his decision *not* to veto Turkey's demolition. Because *Sheridan Kalorama*'s holding on this issue is dispositive here, we quote it in full:

> The plaintiffs—and indeed the [Council] and some other courts—proceed as if the review provision of § 106 automatically applies once a project is deemed

an "undertaking." Such confusion is understandable; for the 1992 amendment oddly appends the concepts of "licensing" and "approval" to the definition of "undertaking," even though the text of § 106 still applies by its terms only to *federally funded* or *federally licensed* undertakings. Thus however broadly the Congress or the [Council] define "undertaking," § 106 applies only to: 1) "any Federal agency having . . . jurisdiction over a proposed Federal or federally assisted undertaking"; and 2) "any Federal . . . agency having authority to license any undertaking." Such an agency is required, as the case may be, either to take certain actions "prior to the approval of the expenditure of any Federal funds on the undertaking," or "prior to the issuance of any license." Therefore, unless Turkey's efforts to replace its chancery are either federally funded or federally licensed, § 106 simply does not apply to its project.

*Id.* at 755-56 (internal citations omitted) (emphases in original). Concluding that the Secretary's inaction constituted neither federal funding nor federal licensing, the court ruled that section 106 did not apply. *Id.* at 756.

Nowhere does the Council's brief so much as mention this relevant discussion from *Sheridan Kalorama*. Instead, the Council points to a different section of the opinion discussing what the court viewed as a puzzling implication of section 301(7)'s introduction. According to the court, the phrase "funded in whole or in part under the direct or indirect jurisdiction of a federal agency, including . . ." seems to "confine the notion of an 'undertaking' " to federally funded projects "and thus by omission to exclude a federally licensed project from the coverage of the statute." *Id.* at 755. "That reading of the definition, however," the court explained, "would deprive the references to licensing in § 106 of any practical effect. We infer, therefore, that the amending Congress [in 1992] intended to expand the definition of an 'undertaking'—formerly limited to federally funded or li-

censed projects—to include projects requiring a federal 'permit' or merely federal 'approval.' " *Id.*

Contrary to the Council's contention, the last sentence of this passage does not hold that section 106 applies to the full range of section 301 "undertakings." Rather, it explains that Congress would not have amended section 301's definition of "undertaking" to exclude federally licensed projects, since doing so would rob section 106's application to "federally funded *or* licensed" undertakings of its full disjunctive scope. *Sheridan Kalorama* therefore concludes that amended section 301 must be interpreted as being at least as broad as section 106. In other words, the passage the Council relies on is entirely consistent with the one it ignores: The former explains that section 301, the definitional section, must be at least as broad as section 106, the jurisdictional section to which it applies; the latter explains that section 301 is in fact broader, since no matter how expansively Congress chooses to define the word "undertaking," section 106 confers on the Council jurisdiction over "*federally funded* or *federally licensed* undertakings*" only.

In sum, *Sheridan Kalorama*'s unambiguous analysis of the relationship between sections 106 and 301 relieves us of the need—indeed authority—to perform our own statutory analysis. *See, e.g.*, *Brewster v. Commissioner*, 607 F.2d 1369, 1373-74 (D.C. Cir. 1979) (panels are bound to follow circuit precedents until en banc court or Supreme Court overrules those precedents). Because *Sheridan Kalorama* holds that "section 106 . . . applies by its terms only to *federally funded* or *federally licensed* undertakings," 49 F.3d at 755 (emphases in original), and not to undertakings that are merely "subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency," 36 C.F.R. § 800.16(y), we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

*So ordered.*