**SPIRIT OF THE SAGE COUNCIL, et al., Plaintiffs,**

v.

**Gale NORTON, Secretary, U.S. Dept. of the Interior, et al., Defendants.**

**No. CIV.A. 98–1873 (EGS).**

United States District Court, District of Columbia.

Dec. 11, 2003.

Meyer & Glitzenstein, Donald Christian Baur, Perkins Coie, LLP, Washington, DC, for Plaintiffs/Counter Defendants.

Charles C. Carson, Morrison & Foerster, LLP, McLean, VA, Charles Ray Shockey, U.S. Department of Justice, Sacramento, CA, Keith William Rizzardi, Eileen Sobeck, U.S. Department of Justice, Washington, DC, for Defendants.

Robert D. Thornton, Nossaman, Guthner, Knox & Elliott, L.L.P., Irvine, CA, Michael Mantell, Lee Axelrad, Resources Law Group, L.L.P., Daniel J. O'Hanlan, Beveridge & Diamond, L.L.P., Sacramento, CA, Benjamin S. Sharp, Perkins Coie, LLP, J. Michael Klise, Steven P. Quarles, Thomas Richard Lundquist, Crowell & Moring, L.L.P., Gary John Smith, Beveridge & Diamond, P.C., Washington, DC, for Intervenor Defendants.

John F. Kostyack, Kimberly Walley Delfino, National Wildlife Federation, Washington, DC, for Amicus.

## MEMORANDUM OPINION AND ORDER

SULLIVAN, District Judge.

This action challenges the validity of two administrative regulations promulgated by the Department of the Interior ("DOI"), the U.S. Fish and Wildlife Service ("FWS"), the Department of Commerce ("DOC"), and the National Marine Fisheries Service ("NMFS") (collectively, "the Services"): the so-called "No Surprises Rule," 63 Fed.Reg. 8,859 (Feb. 23, 1998) (codified at 50 C.F.R. §§ 17.22, 17.32, 222.2) and the "Permit Revocation Rule" ("PRR"), 64 Fed.Reg. 32,712, 32,714 (Jun. 17, 1999), (codified at 50 C.F.R. §§ 17.22(b), 17.32(b)).

The first resolution provides regulatory assurances to holders of Incidental Take Permits ("ITPs") issued pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. § 1532 et seq. (2003), that they will not be required to commit funds or resources beyond those contemplated at the time the permit was issued to mitigate the effects of unforeseen circumstances on threatened or endangered species and their habitats.

The second resolution describes the circumstances under which ITPs may be revoked in light of the No Surprises Rule. The Services' promulgation of these regulations is alleged to violate the ESA and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2003). The parties' cross-motions for summary judgment are now pending before the Court.

## I. Introduction

Plaintiffs are six organizations, a Native American Tribe, and three individuals, one of whom is the Chief of the Shoshone Gabrielino Nation. They contend that the No Surprises Rule, by limiting the obligations of ITP holders to protect threatened and endangered species, flagrantly violates the letter and purpose of the ESA. Plaintiffs further submit that both the No Surprises Rule and the PRR, which was announced during the pendency of this action and sets forth the standards governing revocation of ITPs issued pursuant to the No Surprises Rule, were promulgated in a manner which impermissibly violates the APA's notice and comment requirements, and therefore should be struck down and remanded as procedurally infirm. Defendants' principal arguments on summary judgment are that plaintiffs lack standing and the claims presented in their Second Amended Complaint are not ripe for review.

The Court finds that plaintiffs have standing to assert their claims, and that, at a minimum, plaintiffs' challenge to the PRR is ripe for review. It further concludes that the public notice and comment procedures followed by the Services when

promulgating the PRR were deficient as a matter of law. *See* 5 U.S.C. § 553. Accordingly, the Court will vacate and remand the PRR to the Services for further consideration consistent with the APA. Moreover, the Court finds that the relationship between the PRR and the No Surprises Rule is such that remand of the former requires remand of the latter without further inquiry into the merits of plaintiffs' substantive challenges.

## II. PROCEDURAL HISTORY

The procedural history of this case is somewhat tortured. The action was commenced in July of 1998 as a challenge to the "No Surprises Rule," and the Services filed the administrative record for that regulatory action in December of 1998. Several groups representing ITP holders were granted permission to intervene on February 5, 1999.

Plaintiff filed a First Amended Complaint on the same date. Cross-motions for summary judgment were fully briefed, and oral argument was scheduled for July 15, 1999. Approximately one month before the hearing, the government promulgated a second regulation, the "Permit Revocation Rule," setting forth the circumstances under which an ITP issued with No Surprises assurances could be revoked.

Plaintiffs moved to compel supplementation of the administrative record to include materials relevant to the promulgation of the PRR, and suggested that the second rule was hurriedly drafted and promulgated without the public notice and comment required by the APA in an effort to address the issues raised by plaintiffs' Complaint. *See* Tr. Hr'g 7/15/99 at 6, 18–20, 23. The Court granted plaintiffs' motion to compel and denied the first round of cross-motions for summary judgment without prejudice. *Spirit of Sage v. Babbit,* Civ. A. No. 98–1873, September 20, 1999 Order.

Plaintiffs were subsequently granted leave to file a Second Amended Complaint asserting claims relating to the promulgation of the PRR. Considerable litigation regarding the completeness of the PRR administrative record ensued, culminating in the issuance of a Memorandum Opinion and Order compelling the government to produce administrative record documents withheld as privileged. *Spirit of the Sage v. Babbit,* Civ. A. No. 98–1873, Feb. 15, 2001 *mem. op. and order.* Once defendants complied with the Court's Order, plaintiffs moved for partial summary judgment as to Count III of their Second Amended Complaint, which alleges that promulgation of the PRR violated the APA and ESA.

Defendants filed a second cross-motion for summary judgment. After numerous supplemental memoranda and notices of additional authority were filed, the Court denied plaintiffs' motion for partial summary judgment as to Count III of the Second Amended Complaint *without prejudice,* and directed the parties to modify and renew their motions for summary judgment, integrating all relevant authority.

The parties' third cross-motions for summary judgment are now fully briefed.

## III. PARTIES

Plaintiff, Spirit of the Sage Council ("Council"), is a non-profit membership organization based in Pasadena, California. Second Am. Compl. ¶ 3. The Council is a coalition of Native Americans indigenous to California, other Native Americans, community groups, and citizens dedicated to the protection of America's natural and cultural heritage, endangered species, habitats and ecosystems, and indigenous sacred sites. *Id.* The Council has over 1,000 individual members and thirty organiza-

tional members throughout the United States, British Columbia and Mexico. *Id.*

The Shoshone Gabrielino Nation, a co-founder of the Council, is a state-recognized California Native American Tribe whose ancestral territory is located south of Malibu at Topanga Canyon in Los Angeles, California, continues along the coast to Aliso Creek in Orange County, and covers the area from Catalina Island inland to the San Gabriel and western San Bernadino Mountain ranges. *Id.* ¶ 12. The Tribe and its members use their ancestral territory for educational, recreational, cultural and religious activities. *Id.* Many endangered species, including the Coastal California gnatcatcher, Bald Eagle, Peregrine Falcon, Pacific Pocket Mouse, the Southwestern Willow Flycatcher, the Santa Monica Mountains Dudleya, and the Riverside Fairy Shrimp, along with their habitats, including wetlands, riparian woodlands, and coastal sage scrub ecosystems, are of cultural and religious significance to the Tribe. *Id.* ¶ 13.

Biodiversity Legal Foundation ("BLF") is a Boulder, Colorado, non-profit organization dedicated to the preservation of all native plants and animals, communities of species and naturally functioning ecosystems in the United States. *Id.* ¶ 6.

Plaintiff, National Endangered Species Network ("NESN"), is a non-profit wildlife conservation organization committed to the protection of endangered species and habitats through educational, administrative, and legal action. *Id.* ¶ 9.

The Humane Society of the United States ("HSUS"), is a national animal protection agency based in Gaithersburg, Maryland, and counting over 6 million members throughout the nation. *Id.* ¶ 15. Through public education, litigation, legislative initiatives, research, and investigations, the HSUS seeks to protect wild and domestic animals by opposing activities which destroy wildlife habitat, including

that of endangered and threatened species. *Id.*

The Klamath Forest Alliance ("KFA") is a California non-profit public interest organization created to promote sustainable, healthy, and diverse forest ecosystems and economies in California and Southwest Oregon. *Id.* ¶ 18. KFA's members, volunteers, and Board of Directors include fishermen, fishing guides, and Native Americans who have recreational, occupational, religious and cultural interests in endangered and threatened species and their habitats, including the Northern Spotted Owl, the Coho Salmon, the Klamath Mountain Steelhead, the Bull Trout, the Siskiyou Mountain Salamander, and the Del Norte Salamander. *Id.* ¶ 19.

The Mountaineers, one of the oldest and largest conservation organizations in Washington state, counting more than 15,000 members, has historically taken a strong interest in issues affecting state and private forest lands. *Id.* ¶ 21. The organization is particularly concerned with how timber harvesting operations on those lands affect wildlife and other natural resources. *Id.*

All organizations allege that their members regularly photograph, observe, study and otherwise enjoy endangered and threatened species and their habitats. *Id.* ¶¶ 4, 7, 10, 16, 21. These species include, among others, the Coastal California Gnatcatcher, Bald Eagle, Red Cockaded Woodpecker, Dehli Sands Flower–Loving Fly, Northern Spotted Owl, Peregrine Falcon, Desert Tortoise, Quino Checkerspot Butterfly, Santa Ana Wooley–Star, Giant Garter Snake, Steelhead Trout, Southwestern Willow Flycatcher, Desert Tortoise, Mojave Ground Squirrel, Stephens' Kangaroo Rat, Golden-cheeked Warbler, Aplomado Falcon, Alutian Canada Goose, Northern Spotted Owl, Yaqui Chub, Coho Salmon, Least Bell's Vireo, San Joaquin Kit Fox,

Grizzly Bear, and Gray Wolf. *Id.* ¶¶ 4, 7, 10, 16, 21.

The Department of the Interior ("DOI") is the federal agency ultimately responsible for implementation of the ESA with respect to terrestrial species. Primary responsibility for ESA enforcement lies with the Fish and Wildlife Service ("FWS"), an agency within DOI. Similarly, the Department of Commerce ("DOC") is ultimately responsible for implementation of the ESA with respect to marine species, and has delegated those responsibilities to the National Marine Fisheries Service ("NMFS"), an agency within the DOC.

The Western Urban Water Coalition ("WUWC"), a group of organizations consisting of the Coalition for Habitat Conservation, the National Association of Home Builders, the County of Kern and the Kern Water Bank Authority, the Foothill/Eastern and San Joaquin Hills Transportation Corridor Agencies, the American Forest and Paper Association, and the Building Industry Legal Defense Foundation (collectively, "WUWC"), and a second group of entities consisting of the City of San Diego ("CSD"), the County of San Diego, the County of Orange, and the Irvine Ranch Water District (collectively "CSD *et al.* "), have been granted leave to intervene as defendants in this action. *See Spirit of the Sage v. Babbit,* Civ. A. No. 98–1873, Feb. 4, 1999 Order.

## IV. Statutory and Regulatory Framework

### A. *The Endangered Species Act*

Congress enacted the ESA, 16 U.S.C. §§ 1531–44, "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA has been described by the U.S. Supreme Court as the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 698, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) ("*Sweet Home* ") (quoting *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)).

The ESA imposes both substantive and procedural requirements. The Act defines an "endangered" species as one "in danger of extinction throughout all or a significant portion of its range . . . ." 16 U.S.C. § 1532(6). A "threatened" species is one "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

Section 4 provides that either the Secretary of the Department of the Interior or the Secretary of the Department of Commerce shall determine whether a given species qualifies for designation as endangered or threatened. 16 U.S.C. § 1533(a)(1). Once a species is listed under one of these categories, section 7(a)(2) of the ESA requires each federal agency, in consultation with the Services, to ensure that any action that it authorizes, funds, or implements is not likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of designated "critical habitat." 16 U.S.C. § 1536(a)(2). The Services' implementing regulations prescribe a detailed consultation process, through which the Services assess the biological impacts of any agency's proposed activity. *See* 16 U.S.C. § 1536; 50 C.F.R. § 402.

Section 9, with certain statutory exceptions, makes it unlawful for any person to "take" a member of any species listed as endangered or threatened. 16 U.S.C. §§ 1538(a)(1)(B), (G); 50 C.F.R. § 17.31 (extending the "take" prohibition to threatened species). The statute defines "take"

as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). FWS regulations further define "harm" to include "significant habitat modification or degradation" that "actually kills or injures" wildlife. 50 C.F.R. § 17.3; *see Sweet Home,* 515 U.S. 687, 115 S.Ct. 2407 (upholding regulatory definition of "harm").

## B. *Incidental Take Permits*

In 1982, Congress amended the Endangered Species Act to authorize the Services to permit otherwise prohibited takings of endangered or threatened species, if they are "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). "Incidental take permits are available to landowners and developers who agree to mitigate impacts to listed species through a Habitat Conservation Plan ("HCP"), which must satisfy both ESA screening criteria and further requirements in the Services' regulations, including an assessment of environmental impacts." Defs.' Mem. in Support of Cross–Mot. for Summ. J. ("Defs.' Mot.") at 1. When amending the ESA to provide for ITPs, Congress stated that it was acting to "address[ ] the concerns of private landowners who are faced with having otherwise lawful actions not requiring Federal permits prevented by Section 9 prohibitions against taking." H.R.Rep. No. 935, 97th Cong., 2d Sess. at 29, *reprinted in* 1982 U.S.C.C.A.N. at 2870.

■ Under Section 10 of the ESA, an applicant seeking an ITP authorizing it to "take" endangered or threatened species in the course of its activities on private land must prepare a Habitat Conservation Plan ("HCP") specifying:

(i) the impact which will likely result from such taking;

(ii) the steps the applicant will take to minimize and mitigate such impacts;

(iii) any alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and

(iv) such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan.

16 U.S.C. § 1539(a)(2)(A).

Upon review of the plan, the Services must find that the taking will be incidental; the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; the applicant will ensure that adequate funding for the plan will be provided; [and] the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild.

16 U.S.C. § 1539(a)(2)(B). Before issuing an ITP, the Secretary must also provide "an opportunity for public comment[ ] with respect to a permit application and the related conservation plan ..." *Id.* Issuance of a Section 10 permit constitutes federal agency action under Section 7. Defs.' Mot. at 5. Therefore, the Service must conduct an intra-agency consultation under Section 7(a)(2) before issuing an ITP. *Id.*

In 1985, the FWS adopted regulations implementing Section 10 of the ESA, which stipulate that each ITP applicant must submit a "conservation plan that specifies," *inter alia,* "[t]he impact that will likely result from such taking," as well as "steps the applicant will take to monitor, minimize, and mitigate such impacts, the funding that will be available to implement such steps, and the procedures to be used to deal with unforeseen circumstances." [1] 50 C.F.R. § 17.22(b)(1)(iii)(B)

---

1. The Services also promulgated administrative and procedural regulations applicable to all permits issued pursuant to various environmental statutes, including ITPs. *See* 50 C.F.R. Parts 13, 17.

(1992). The preamble to the 1985 regulations explained that this provision was "needed" because "circumstances requiring modification of a conservation plan could arise even during the life of a permit with a relatively short term." 50 Fed.Reg. 39,684 (Sept. 30, 1985). Accordingly, the regulations require the Services to include in each HCP specific measures to address any changed circumstances arising during the lifetime of the ITP which may jeopardize the survival and recovery of the threatened or endangered species covered by the plan. 50 C.F.R. §§ 17.22(b)(1)(iii)(B), 17.32(b)(1)(iii)(B). Additionally, ITP holders were required to agree to change the terms of their HCPs if such changes become necessary to conserve the species. *Id.*

The NMFS promulgated similar regulations in 1990 which also recognized that "circumstances and information may change over time," thus justifying a requirement that ITP applicants' HCPs contain "a procedure by which NOAA, Fisheries and the permit holder will deal with unforeseen circumstances." 55 Fed.Reg. 20,603, 20,605 (May 18, 1990) (codified at 50 C.F.R. 222.22).

## C. *No Surprises*

In an August 11, 1994 public statement, the DOC and DOI announced, without any prior public notice and comment, a "No Surprises" policy which was to go into effect immediately. Administrative Record ("AR") Vol. 1, Docs. 1 & 2. The policy required Services approving HCPs to provide landowners with "assurances" that, once an ITP was approved, even if circumstances subsequently changed in such a way as to render the HCP inadequate to conserve listed species, the Services would not impose additional conservation and mitigation requirements which would increase costs or further restrict the use of natural resources beyond the original plan. *Id.* The stated purpose of the policy was to "provid[e] regulatory certainty in exchange for conservation commitments." *See Habitat Conservation Planning Handbook.* Pursuant to the policy, upon an applicant's request, No Surprises "assurances" were incorporated in all HCPs approved by the Services after August of 1994.

On October 31, 1996, environmental groups and individuals, some of whom are plaintiffs in this action, filed an action challenging the "No Surprises" policy on the grounds, *inter alia,* that it had been promulgated without complying with the APA's notice and comment requirements. Second Am. Compl. ¶ 54; *Spirit of the Sage v. Babbitt,* Civ. A. No. 96–2503 (D.D.C.). The parties reached a settlement agreement, approved by the Court on March 20, 1997, which required the defendants to solicit and consider public comment before publishing a final decision with respect to No Surprises assurances. *Id.*

According to plaintiffs, the "vast majority" of the over 800 public comments received opposed the proposed rule on a number of grounds. *Id.* ¶¶ 55–56; *see also* A.R. vol. 1, Doc. 9 at 23 ("tally of commenters" indicating that 755 opposed the rule and 38 supported it as drafted). Persons and entities expressing opposition to the Rule included national conservation, animal protection, and environmental organizations, Native American tribes, and conservation biologists. Pls.' Mem. in Supp. Mot. Summ. J. ("Pls.' Mot."), Ex. B at 1–3. Scientists in particular expressed concern that, because ITPs can be approved for many decades, some mechanism for modification of their attendant HCPs in response to inevitable "surprises" such as "new diseases, droughts, storms, floods, and fire" was necessary. *Statement on Proposed Private Lands Initiatives from the Meeting of Scientists at Stanford University* (April 1997) (hereinafter "Stanford

Statement"), quoted in A.R., vol. 5, comm. 683 at 10. Absent means for ongoing modification of HCPs, they concluded that "habitats and species certainly will be lost." *Id.* The proposed rule further specified that, should unforeseen circumstances arise, the burden of "implementing additional conservation measures would be borne by the Federal government," 62 Fed.Reg. 29,091 (May 29, 1997), leading some comments to emphasize that, given chronic funding shortages which render them unable to fulfill even their basic enforcement responsibilities, the Services are ill-equipped to take on the responsibility of implementing mitigation measures when unforeseen circumstances arise. *See, e.g.,* A.R. vol. 2, comm. 74 at 1.

Notwithstanding the number of comments calling the proposal into question, the Services promulgated a final No Surprises Rule which essentially codified the No Surprises policy. The new rule provides that "no additional land use restrictions or financial compensation will be required of the permit holder with respect to species covered by the permit, even if unforeseen circumstances arise after a permit is issued indicating that additional mitigation is needed for a given species covered by a permit." 63 Fed.Reg. 8859 (Feb. 23, 1998), codified at 50 C.F.R. §§ 17.22, 17.32.

The final No Surprises Rule distinguishes between "changed circumstances" and "unforeseen circumstances," defining "changed circumstances" as those which can "reasonably be anticipated by plan developers and the Service and that can be planned for . . . ." 63 Fed.Reg. 8870; 50 C.F.R. §§ 17.3 and 222.3. Conversely, "unforeseen circumstances" are those which "could not reasonably have been anticipated by plan developers and the Service at the time of the conservation plan's negotiation and development, and that result in a substantial and adverse change in the status of the covered species." *Id.* Even where, under the current terms of an ITP, "unforeseen circumstances" place a listed species at risk of certain extinction or make recovery of a species impossible, the No Surprises Rule stipulates that the Services will *never* "require the commitment of additional land, water, or financial compensation or additional restrictions on the use of land water or other natural resources beyond the level otherwise agreed upon for the species covered by the conservation plan without the consent of the permittee." *Id.*

Additional conservation and mitigation measures can only be required of an ITP holder if they are limited to "modifications within conserved habitat areas, if any, or to the conservation plan's operating conservation program." 50 C.F.R. § 17.22(b)(5)(iii)(C). An entity other than the ITP permit holder may take "additional actions at its own expense to protect or conserve a species included in a conservation plan." 50 C.F.R. § 17.22(b)(6).

The No Surprises Rule also limits what can be required of an ITP holder even if foreseeable "changed circumstances" arise. Essentially, the rule prohibits the Services from "requir[ing] any conservation and mitigation measures in addition to those provided for in the plan," unless the plan specifically authorizes imposition of such additional requirements, even where "additional conservation and mitigation measures are deemed to be necessary" to conserve a species. *Id.* Moreover, HCPs are not required to authorize additional measures designed to address foreseeable changes in circumstances. *Id; see also* 63 Fed.Reg. 8,863 ("reasonably foreseeable circumstances, including natural catastrophes that normally occur in the area, *should* be addressed in the HCP").

Finally, the Services themselves are not required to take any specific remedial actions when, based on "unforeseen cir-

cumstances" or foreseeable "changed circumstances" not provided for by an HCP, activities undertaken pursuant to an ITP place a listed species in danger of extinction or significantly impaired recovery. The Services also concede that any action they would take to mitigate the effects of unforeseen or changed circumstances would be "dependent on the availability of appropriated funds." 63 Fed.Reg. at 8,864.

In the first decade following the enactment of Section 10 of the ESA, only 14 ITPs were issued. Defs.' Mot. at 8. According to federal defendants, adoption of "[t]he No Surprises policy resulted in an immediate and dramatic increase in the number of HCP permits" issued. Defs.' Mot. at 8. As of April 17, 2002, 379 ITPs with No Surprises assurances have been issued, covering approximately 30 million acres and affecting more than 200 endangered or threatened species. Pls.' Mot. at 12 n. 7.

### D. *Permit Revocation Rule*

During the pendency of this litigation, the FWS promulgated the Permit Revocation Rule ("PRR"). 64 Fed.Reg. 32,712, 32,714 (Jun. 17, 1999), (codified at 50 C.F.R. §§ 17.22(b), 17.32(b)). The PRR amends the regulations specifically applicable to ITPs, which now include the No Surprises Rule, and provides, in pertinent part, that an ITP "may not be revoked . . . unless continuation of the permitted activity would be inconsistent with the criterion set forth in 16 U.S.C. § 1539(a)(2)(B)(iv)," [2] and the "inconsistency has not been remedied [by the Services] in a timely fashion." 64 Fed.Reg. 32,712, 32,714, codified at 50 C.F.R. §§ 17.22(b), 17.32(b). The defendants submit that the purpose of the PRR was simply to "explain" how the Services' pre-existing permit revocation power would apply to ITPs issued pursuant to the No Surprises Rule.[3] *See* Tr. Hr'g 7/15/99 at 6.

Plaintiffs maintain that the PRR represented a substantive change in the regulations, and therefore was subject to the notice and comment requirements of the APA. *See* 5 U.S.C. § 553. They further submit that the public was not afforded any opportunity to comment on the rule. *See* Second Am. Compl. at ¶ 67. Plaintiffs also argue that the PRR further undermines the conservation and protection of endangered and threatened species by imposing a higher threshold for revocation of ITPs compared to that applicable to other permits issued by the Services.[4]

---

**2.** 16 U.S.C. § 1539(a)(2)(B)(iv) sets forth, as one of the conditions for issuance of an ITP, that "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild."

**3.** At the same time, the FWS promulgated a second rule exempting ITPs from the general permit revocation regulations, which authorize revocation of any FWS permit when "populations of the wildlife or plant that is subject of the permit declines to the extent that continuation of the permitted activity would be detrimental to maintenance or recovery of the affected population." 64 Fed.Reg. 32,711. Plaintiffs similarly argue that this rule was both subject to the notice and comment requirements of the APA and promulgated in violation thereof. Because this entire action can be disposed of based on plaintiffs' claims relative to the PRR, the Court does not reach the procedural or substantive propriety of the promulgation of the second rule exempting ITPs from general permit revocation provisions.

**4.** According to plaintiffs, under the new rule, ITPs can only be revoked when activities taken pursuant to them are impairing *both* "survival and recovery" of an *entire* species "in the wild," whereas other kinds of permits can be revoked where activities authorized are merely "detrimental to maintenance *or* recovery" of an "affected *population*" of a species. Pls.' Mot. at 14. Furthermore, revocation of an ITP must be preceded by efforts by the Service itself to "remedy" the problem in an undefined "timely fashion," thereby establishing a new threshold requirement. *Id.* at 14–15.

## V. PLAINTIFFS' CLAIMS

### A. *No Surprises Rule*

In Count I of their Second Amended Complaint, plaintiffs allege that the No Surprises Rule violates Sections 2, 3(3), 7(a)(1) and 7(a)(2) of the ESA, as well as its implementing regulations, by:

(1) precluding the Services from making changes to ITPs which may be necessary to ensure the survival or recovery of endangered or threatened species;

(2) allowing the Services to issue ITPs under circumstances not authorized by the ESA itself, *i.e.* regardless of whether the permittee meets the requirements of 16 U.S.C. § 1539(a)(2)(B);[5] and

(3) eliminating, as to the questions of whether a particular ITP should include No Surprises assurances, and if so, for how long and under what circumstances, the statutorily required "opportunity for public comment" on each ITP prior to its issuance.

In Count II, plaintiffs allege that the No Surprises Rule was promulgated in violation of the APA because the defendants acted in a manner that was "arbitrary and capricious" by failing to:

(1) adequately consider or respond to public comments;

(2) offer a rationale for the rule that was consistent with the ESA; and

(3) address proposed reasonable alternatives which would have been more consistent with the purposes of the Act.

### B. *Permit Revocation Rule*

In Count III, plaintiffs challenge as violative of both the ESA and the APA defendants' failure to:

solicit or consider any public comment prior to promulgating the PRR; adequately explain the process and standards by which the FWS will revoke, but not modify, permits where species are placed in jeopardy.

### C. *Request for Relief*

Plaintiffs seek an Order of this Court:

I. declaring that defendants violated both the ESA and the APA by promulgating the No Surprises Rule and the PRR;

II. vacating the No Surprises Rule and enjoining its implementation;

III. vacating the PRR pending public notice and comment;

IV. enjoining the Services from making any No Surprises assurances in the future until further Order of the Court;

V. awarding plaintiffs attorneys' fees and costs.

## VI. ANALYSIS

### A. *Standard of Review*

Summary judgment should be granted only if the moving party has shown that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

---

**5.** 16 U.S.C. § 1539(a)(2)(B) requires that the Services find, prior to issuing an ITP, that the taking will be incidental;

 I. the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; the applicant will ensure that adequate funding for the plan will be provided; [and]

 II. the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild.

16 U.S.C. § 1539(a)(2)(B).

Likewise, when ruling on cross-motions for summary judgment, the court may grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law on material facts that are not genuinely disputed. *See Rhoads v. McFerran*, 517. F.2d 66, 67 (2d Cir.1975). "The court must rule on each party's motion on an individual and separate basis, determining in each case whether a judgment may be entered" in accordance with Fed.R.Civ.P. 56. *Held v. American Airlines, Inc.*, 13 F.Supp.2d 20, 23 (D.D.C. 1998).

■ When reviewing agency action pursuant to the APA on motions for summary judgment, we "review the administrative record directly.... [to] ... determine whether the agency has complied with the APA; specifically, whether its actions have been arbitrary or capricious, including whether it has acted consistently with its own procedures; and whether its applications of its governing law have been reasonable." *Troy Corp. v. Browner*, 120 F.3d 277, 281 (D.C.Cir.1997) (citations omitted).

## B. *Standing*

■ Defendants argue that plaintiffs lack standing to assert their claims. Defs.' Mem. at 1. Article III of the Constitution mandates that, prior to invoking the jurisdiction of the federal courts, plaintiffs must demonstrate:

(1) "injury in fact" that is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.'"

(2) causation, "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant."

(3) redressability, "a likelihood that the requested relief will redress the alleged injury."

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102–04, 118 S.Ct. 1003, 1016–1017, 140 L.Ed.2d 210 (1998) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

### 1) *Injury in fact*

■ All plaintiff organizations, as well as several individual members, allege that specific ITPs containing No Surprises guarantees are causing otherwise unlawful taking of endangered species, as well as habitat destruction. *Id.* ¶¶ 5, 8, 11, 14, 17, 22, 23–31. Furthermore, several individual members named as plaintiffs have submitted affidavits asserting specific harms to their interests in observing endangered species and their habitats caused by particular ITPs alleged to contain No Surprises assurances. *Id.* ¶¶ 23–31.

Most importantly, plaintiffs claim that "[t]he No Surprises rule substantially increases the likelihood that the Services will issue additional permits allowing the taking and habitat destruction of species in which plaintiffs and their members, supporters, officers and board members have an interest—by encouraging developers to obtain such permits—and will thereby hasten the extinction of species affected by such permits when ITP/HCPs containing No Surprises guarantees fail to protect and conserve endangered and threatened species." *Id.* ¶ 32.

Plaintiffs further submit, relying on scientists' declarations that the advent of unforeseen circumstances during a permit's lifetime is almost certain, that there is nothing speculative about the likelihood that unforeseen circumstances will arise and will not be addressed by ITP holders under the No Surprises Rule. *See, e.g.* Stanford Statement, quoted in A.R., vol. 5, comm. 683 at 10.

Finally, plaintiffs assert that harms to their procedural rights under both the

APA and the ESA are sufficient to establish standing.

It is defendants' position that plaintiffs cannot establish standing except through a direct challenge to an individual ITP containing No Surprises Assurances. Defendants also challenge the sufficiency of the affidavits submitted by plaintiffs in support of their assertion of standing, alleging that the ITPs referenced therein either were issued prior to the promulgation of the No Surprises Rule or have not as yet been finalized.

Defendants further argue that any harm to plaintiffs' interests arising from the operation of the No Surprises Rule is purely speculative, as plaintiffs have not identified an ITP for which circumstances are such that either the permit holder or the Services have failed to take any specific action based on the No Surprises assurances in the permit.

The Court finds that plaintiffs' assertion of harm arising from the substantial and unprecedented increase in the number of ITPs sought and issued since the advent of the No Surprises Rule is sufficient to establish injury-in-fact.

The government itself concedes that there has been a "dramatic increase in HCPs since the institution of the No Surprises Rule." Defs.' Mot. at 22 n. 2. Indeed, defendants themselves predicted, or at least hoped for, such an explosion. Pls.' Reply at 14; *see Competitive Enter. Inst. v. Nat'l Hwy. Traffic Safety Admin.*, 901 F.2d 107, 114–18 (D.C.Cir.1990) (agency's own fact finding demonstrated causal effect between regulation of fuel efficiency and availability of larger and heavier vehicles).

The government also admits that it is likely that these permits would not otherwise have been sought or issued in the absence of the No Surprises Rule, characterizing the Rule as a "carrot" or incentive for landowners to develop HCPs and apply for ITPs. Defs.' Mot. at 22 n. 2.

Plaintiffs are correct in their assertion that there is nothing speculative about the alleged injury resulting from this dramatic increase in the number of outstanding ITPs authorizing private landowners to engage in activities resulting in otherwise unlawful takings of threatened and endangered species. This alleged harm is sufficient, standing alone, to meet Article III's requirement that plaintiffs demonstrate injury-in-fact.

### 2) *Causation and redressability*

█ Having thus established injury-in-fact, plaintiffs argue that causation and redressability exist, notwithstanding the fact that it is the activities of third-party ITP holders which is alleged to be the direct cause of plaintiff's harm. According to plaintiffs, the takings authorized by any additional ITPs issued since the No Surprises Rule was promulgated would be unlawful under the ESA in the absence of those permits. Pls.' Reply at 10–11, citing *Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426, 440 (D.C.Cir.1998) ("Supreme Court precedent establishes that the causation requirement for constitutional standing is met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise.").

Plaintiffs' allegation that the increase in the number of ITPs issued since the No Surprises Rule was promulgated will result in additional otherwise unlawful takings of listed species brings this case within the reach of this Circuit's opinion in *Animal Legal Defense Fund, Inc. v. Glickman*, and causation is therefore established.

Defendants contend that plaintiffs have failed to establish redressability because invalidation of the Rule would not result in revocation of the permits alleged to be the cause of plaintiffs' harm.[6] While it is true that, in the event the No Surprises Rule were to be struck down by this Court, the additional ITPs issued since the promulgation of the No Surprises Rule would remain in place, *vacatur* of the No Surprises rule would nonetheless enable the Services to require permit holders to mitigate plaintiffs' harm.

Moreover, plaintiffs correctly observe that, when alleging procedural violations in the context of APA review, they need not demonstrate that the relief requested, *i.e.* remand for further rulemaking in accordance with the APA, would lead to a different outcome. Pls.' Reply at 12, citing *Lujan v. Defenders of Wildlife*, 504 U.S. at 573 n. 7, 112 S.Ct. 2130.

Accordingly, the Court concludes that plaintiffs have met Article III's standing requirements.

## C. *Ripeness*

Defendants next argue that, even if this Court finds that plaintiffs have standing to bring this action, their facial challenges to the No Surprises Rule and PRR are not yet ripe for review.

The Court finds that both regulations represent substantive rules leaving the agency little or no discretion in their application. Therefore, plaintiffs' claims present purely legal questions which would not benefit from any further factual development through application to specific ITPs. Accordingly, the claims now before the Court are ripe for APA review.

"Ripeness 'requires us to evaluate both the fitness of the issues for judicial

decision and the hardship to the parties of withholding court consideration.' " *National Park Hospitality Ass'n v. Dept. of the Interior*, 538 U.S. 803, 123 S.Ct. 2026, 2030, 155 L.Ed.2d 1017 (2003); *Texas v. U.S.*, 523 U.S. 296, 300–01, 118 S.Ct. 1257, 1260, 140 L.Ed.2d 406 (1998); *National Min. Ass'n v. Fowler*, 324 F.3d 752, 756 (D.C.Cir.2003) ("The framework for analyzing the ripeness of preenforcement agency action is well established.... [W]e must consider 'both the fitness of the issue[ ] for judicial decision and the hardship to the parties of withholding court consideration.' ") (internal citations omitted). Our Circuit has further clarified that

> Within this framework, "[i]f we have doubts about the fitness of the issue for judicial resolution, then we balance the institutional interests in postponing review against the hardship to the parties that will result from delay. Where, however, there are no significant agency or judicial interests militating in favor of delay, [lack of] hardship cannot tip the balance against judicial review."
> *Id.* at 756–757.

### 1) *Fitness for judicial resolution*

Beginning with fitness, "we ask first whether the issue raised in the petition for review presents a purely legal question, in which case it is presumptively reviewable."

*National Min. Ass'n v. Fowler*, 324 F.3d at 756–757. In this case, plaintiffs present "purely legal" challenges to substantive rules promulgated by an agency with statutorily delegated power which are plainly ripe for judicial review under controlling precedent. *See CropLife America v. EPA*, 329 F.3d 876, 881, 884 (D.C.Cir.2003) (holding that "binding regulation" promul-

---

**6.** ITPs issued under the No Surprises Rule contain severability clauses which preserve the validity of the permits in the event the No Surprises assurances contained therein are subsequently found to be contrary to law.

gated by the EPA was ripe for review because it presents a "purely legal question" and unambiguously precludes agency action of a certain type, even though plaintiffs did not challenge its application on specific facts).

Defendants argue that further factual development is required to adjudicate plaintiffs' claims, and specifically contend that the Court cannot determine whether the No Surprises Rule, the PRR, or both violate the ESA unless and until it examines the effects of those regulatory provisions on the operation of particular ITPs issued pursuant to those regulations. However, it is not clear what purpose awaiting the application of the rules to specific ITPs would serve, given that the agency has no discretion whether to apply either rule in the context of a particular ITP.

Defendants principally rely on the U.S. Supreme Court's recent decision in *National Park Hospitality Ass'n v. Dept. of the Interior*, 538 U.S. 803, ——, 123 S.Ct. 2026, 155 L.Ed.2d 1017, 2003 WL 21210427 at * 4, which states that

> Absent a statutory provision providing for immediate judicial review, a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the Administrative Procedure Act (APA) until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens harm to him. (The major exception, of course, is a substantive rule which as a practical matter requires the plaintiff to adjust his conduct immediately . . . .)

(citing *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 891, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). In that case, the Court concluded that, even though the question presented was "purely legal," "further factual development would 'significantly advance [its] ability to deal with the legal issues presented.'" *Id.* at ——, 123 S.Ct. 2026, 2003 WL 21210427 at * 6.

The Court specifically found that the question of whether a National Park Service regulation providing that the Contract Disputes Act of 1978 is inapplicable to concession contracts was a "purely legal one," involving a challenge to a "final agency action," but nevertheless concluded that, because the challenged regulation might be without application under certain as-yet-undetermined circumstances, and because plaintiffs relied on the specific characteristics of certain types of contracts to support their positions, "judicial resolution of the question presented . . . should await a concrete dispute about a particular concession contract." *Id.*

Defendants submit that the case now before this Court is analogous to that in *Nat'l Park Hospitality Ass'n*, because plaintiffs have yet to pose a challenge to a single HCP with No Surprises assurances, and therefore the holding in that case counsels against finding plaintiffs' facial challenges ripe for judicial review.

Plaintiffs counter that the rationale of *Nat'l Park Hospitality Ass'n* is inapplicable to this case, submitting that the Court's holding in that case turned on a determination that the National Park Service had no "delegated rulemaking authority" with respect to the Act it construed. As a result, its regulation was not "a legislative regulation with the force of law" and therefore did not create "adverse effects of a strictly legal kind" on concessionaires. *See National Park Hospitality Ass'n v. Dept. of the Interior*, at ——, 123 S.Ct. 2026, 2003 WL 21210427 at * 4. Accordingly, until the Act was further construed in a manner which actually bound third parties,

the plaintiffs' challenge was not ripe for review.

Conversely, it is undisputed in this case that the Services exercised statutorily delegated rulemaking authority when promulgating the challenged rules. It is also uncontested that both the No Surprises Rule and the PRR are currently binding on the Services themselves, and vest third parties with regulatory rights. Accordingly, this case is easily distinguished from that before the Court in *National Park Hospitality Ass'n v. Dept. of the Interior.*

▮▮▮ Defendants also cite to "the familiar proposition that a court should reject a facial challenge, either as unripe or meritless, when the challenger's success turns on the assumption that the agency will exercise its discretion unlawfully." *See National Min. Ass'n v. U.S. Army Corps of Engineers,* 145 F.3d 1399, 1408 (D.C.Cir.1998). That proposition is also without relevance to the facts of this case. Both the No Surprises Rule and the PRR give rise to circumstances precisely analogous to those considered by our Court of Appeals in *Nat'l Min. Ass'n,* in which the "faithful application" of the challenged regulations could, according to plaintiffs "carry the agency beyond its statutory mandate." *Id.* Neither Rule leaves the Services with any discretion, and thus defendants' assertion that additional evidence shedding light on the manner in which the Services will apply the challenged regulations in specific circumstances is necessary to assist the Court in resolving plaintiffs' claims is unpersuasive. The Court therefore concludes that plaintiffs' challenges to the No Surprises Rule and the PRR are ripe for APA review on the record now before the Court.

2) *Hardship arising from withholding judicial decision*

Because the Court finds that the issues before it are fit for judicial review, it need not tarry long on the second prong of the ripeness analysis. *See National Min. Ass'n v. Fowler,* 324 F.3d at 756–57. Furthermore, defendants have not identified any specific compelling interests in postponing a decision on the merits of plaintiffs' claims. Conversely, plaintiffs allege ongoing harm to species and habitats protected by the ESA. Clearly, the balance of harms weighs in favor of a finding that the issues presented are ripe for judicial review.

### D. Merits

Having thus concluded that plaintiffs have standing to bring this action, and that their claims are ripe for judicial review, the Court now turns to the merits of plaintiffs' claims. The Court need only address the procedural challenges to PRR, as resolution of those claims effectively disposes of the entire case. Finding that the PRR was promulgated in violation of the APA's notice and comment requirements, the Court will vacate and remand the PRR for further consideration by the Services. Moreover, because the government explicitly relies on the PRR to bolster its contention that the No Surprises Rule is consistent with the requirements of the ESA, the Court will not reach the merits of plaintiffs' substantive challenges to the No Surprises Rule, and instead remands the No Surprises Rule for consideration as a whole with the PRR.

1. *Public Notice and Comment*

▮▮▮ Under the APA, federal agencies generally must publish notice of proposed rulemaking in the Federal Register to give interested persons an opportunity to comment and participate in the rulemaking. 5 U.S.C. § 553(b). That notice-and-comment provision applies to "legislative" or "substantive" rules that establish legal requirements, but not to "interpretive rules,

general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A).

 The D.C. Circuit has described the distinction between an interpretive and substantive rule:

the "critical" feature of the procedural exception "is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency . . . ." The issue, therefore, "is one of degree," and our task is to identify which substantive effects are "sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA."

*JEM Broadcasting Co. v. FCC*, 22 F.3d 320, 326–27 (D.C.Cir.1994). "[A] legislative or substantive rule is one that does more than simply clarify or explain a regulatory term, or confirm a regulatory requirement, or maintain a consistent agency policy." *National Family Planning and Reproductive Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 237 (D.C.Cir.1992). Of particular relevance to this case, the Circuit has stated that a rule intended to "grant rights, impose obligations, or produce other significant effects on private interests," or which " 'substantially curtails [an agency's] discretion in . . . decisions and accordingly has present binding effect,' is a legislative rule." *Id.* at 238, 239.[7]

It is clear under this Circuit's precedent that the PRR represents a legislative rule subject to the notice and comment requirements of the APA. It narrows the Services' discretion to revoke ITPs, adds a threshold precondition to permit revocation

where ITPs are concerned, and significantly raises the bar as to the degree of harm to listed species which must be likely to occur in the absence of corrective action before an ITP permit can be revoked. Prior to promulgation of the PRR, the Services could revoke an ITP once "the population(s) of the wildlife or plant that is the subject of the permit declines to the extent that continuation of the permitted activity would be detrimental to maintenance *or* recovery of the affected *population.*" *See* 50 C.F.R. § 13.28(a)(5) (emphasis added). It appears beyond dispute that, following promulgation of the PRR, the Services can no longer revoke an ITP under these circumstances. 50 C.F.R. § 17.22 (An ITP "may not be revoked for any reason except those set forth in § 13.28(a)(1) through (4) or unless continuation of the permitted activity would be inconsistent with the criterion set forth in 16 U.S.C. 1539(a)(2)(B)(iv) and the inconsistency has not been remedied in a timely fashion."). Instead, so long as "the taking will not appreciably reduce the likelihood of the survival *and* recovery of the *species* in the wild," the permittee commits no procedural violations, and the law does not change, the PRR precludes the Services from revoking an ITP.

The difference between the two standards is significant: the first refers to maintenance and recovery in the disjunctive, and focuses on specific populations of listed species, whereas the second requires a showing that both *survival* and recovery of an entire *species* be affected by an activity authorized by an ITP before permit revocation can even be contemplated. As stated in the final rule itself, "[i]n keeping with the 'No Surprises' rule . . . these

---

7. Furthermore, courts have held that "an agency seems likely to have intended a rule to be legislative if it has the rule published in the Code of Federal Regulations." *American Min. Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C.Cir.1993).

The PRR was published in the Code of Federal Regulations, which includes only rules "having general applicability and legal effect." *American Min. Congress v. Mine Safety & Health Admin.*, 995 F.2d at 1109.

provisions would allow the Service to revoke an HCP permit as a last resort in the narrow and unlikely situation in which an unforeseen circumstance results in likely jeopardy to a species covered by the permit and the Service has not been successful in remedying the situation through other means." As a result, it is apparent that the PRR vests private ITP holders with a new right not to have their ITPs revoked under circumstances for which revocation would have been available under the previous regulatory regime, and for which revocation remains possible for other types of permits.

Furthermore, by precluding ITP revocation "unless continuation of the permitted activity would be inconsistent with the criterion set forth in 16 U.S.C. § 1539(a)(2)(B)(iv) *and* the *inconsistency has not been remedied in a timely fashion*," 50 C.F.R. § 17.22 (emphasis added), the PRR adds a new precondition to revocation of an ITP which does not apply to revocation of other permits, namely that "the Service has not been successful in remedying the situation through other means." *See* 64 C.F.R. § 32.709. "When an agency changes the rules of the game— such that one source becomes solely responsible for what had been a dual respon-

sibility and then must assume additional obligations ... more than a clarification has occurred." *Sprint Corp. v. FCC*, 315 F.3d 369, 374 (D.C.Cir.2003).

Defendants themselves concede that the final No Surprises rule "did not exempt ITPs from the ... permit revocation provisions in 50 C.F.R. § 13.28(a)(5)," thus confirming that the PRR amended the pre-existing substantive rules for revocation of ITPs with No Surprises assurances. *See* Defs.' 4/23/99 Mem. in Supp. of Cross–Mot. for Summ. J. at 8; *National Family Planning and Reproductive Health Ass'n, Inc. v. Sullivan*, 979 F.2d at 235 ("It is a maxim of administrative law that: 'If a second rule repudiates or is irreconcilable with [a prior legislative rule], the second rule must be an amendment of the first; and, of course, an amendment to a legislative rule must itself be legislative.' "); *Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579, 582 (D.C.Cir.1997) (an agency's "change in interpretation is contrary to the Administrative Procedure Act because it circumvents section 553, which requires that notice and comment accompany the amendment of regulations.")

("Even if not a change, it constitutes a substantive addition which itself requires notice and comment.").[8] Defendants nev-

---

**8.** Plaintiffs also cite to a number of e-mail and memoranda messages from attorneys within the Solicitor's office referring to the "APA/inadequate public notice problems with the current ... rulemaking," Second Supplement to Administrative Record, Privilege Index ("PI"), document 15, stating that the proposed PRR "cannot be reconciled with the common understanding of what a clarifying change would be," and describing the PRR as a "stealth rule," Second Supplement to Administrative Record, Privilege Index ("PI"), document 24 at 2. They also point out that an e-mail message from an attorney within the Office of the Solicitor describing removal of certain general permit revocation criteria in the context of HCPs issued under the No Surprises Rule as a "major substantive change" "unhelpful" to fulfilling the purposes

of the ESA in HCP negotiations. Second Supplement to Administrative Record, Privilege Index ("PI"), document 12.

Finally, plaintiffs refer to an e-mail message from the Solicitor of the DOI noting that the previous regulatory regime allowed revocation of an ITP when it threatened the recovery of a listed species, without requiring that the species be placed in jeopardy of extinction before revocation is authorized, and noting that "there can be a considerable difference between the two" standards. Second Supplement to Administrative Record, Privilege Index ("PI"), document 20 at 2. Defendants submit that these e-mail communications do not represent agency "admissions," but rather, informal, pre-decisional documents of no binding effect on the agency. The Court need not resolve the question of how much weight

ertheless maintain that the PRR does not announce a new substantive rule with the force of law, but rather "merely conformed FWS agency regulations to the statute" by specifying that revocation of ITPs would be conducted by reference to statutory issuance criteria. Defs.' Mot. at 35. The Services' self-serving statements in this regard hold no persuasive weight in the face of the language of the regulation itself, which clearly imposes new obligations, vests new rights, and further restricts agency discretion.

Accordingly, the Court concludes that the PRR is a substantive rule subject to the notice and comment requirements of the APA.

### (a) Logical outgrowth doctrine

■ In the event that the Court finds the PRR to be a substantive rule, defendants invoke the "logical outgrowth doctrine," maintaining that the final PRR issued in June of 1999 is a "logical outgrowth" of a June 1997 Federal Register Notice which "propose[d] technical amendments to [the Services'] general regulations (50 C.F.R. part 13) which are applicable to all of its various permitting programs ... These proposed revisions would clarify the application of existing general permit conditions to the permitting procedures associated with [ITPs] issued under section 10 of the Act." 62 Fed.Reg. 32,189. Defendants contend that through this notice, the Service "clearly announced the full scope of rulemaking," to include consideration of the revocation standard applicable to ITPs issued pursuant to the No Surprises Rule. Defs.' Mot. at 36. Defendants' arguments in this regard are without merit.

The "logical outgrowth" doctrine has been described by the D.C. Circuit as follows: "a final rule that is a logical outgrowth of the proposal does not require an additional round of notice and comment even if the final rule relies on data submitted during the comment period." *Bld'g Indus. Ass'n of Super. California v. Norton*, 247 F.3d 1241, 1246 (D.C.Cir.2001).

In a recent case applying the doctrine, this Circuit held that an agency was not required to publish a scientific study it had relied on in the development of a final rule which "only confirmed the findings delineated in the proposal." *Id.* The Circuit held that, under such circumstances, an agency need not subject itself to "perpetual cycles of new notice and comment periods." *Id.*

■ According to the D.C. Circuit, "the test, imperfectly captured in the phrase 'logical outgrowth,' is whether [a member of the public] ex ante, should have anticipated that a [particular] requirement might be imposed." *Small Refiner Lead Phase–Down Task Force v. U.S. EPA*, 705 F.2d 506, 548–49 (D.C.Cir.1983). Where the connection between an agency's request for comments and final rule is "simply too tenuous," the logical outgrowth doctrine is inapplicable. *Id.* at 548–49; *see also National Min. Ass'n v. Mine Safety and Health Admin.*, 116 F.3d 520, 531 (D.C.Cir.1997) ("Notice [i]s inadequate when 'the interested parties could not reasonably have anticipated the final rulemaking from the draft [rule].' ").

■ The "logical outgrowth" principle has no conceivable applicability in this case, particularly given that the language of the June 1997 proposal does not even suggest that any provision of the existing

can be given to these communications, as the undisputed record before it clearly supports a

finding that the PRR was a substantive rule.

revocation regulations would no longer apply to ITPs, but rather specifically provides that "the provisions in [part 13] are in addition to, and not in lieu of, other permit regulations of this subchapter and apply to all permits issued thereunder." [9] 62 Fed.Reg. 32,191. General notice that an agency "might make unspecified changes" to a regulation "is too general to be adequate." *Id.* "Agency notice must describe the range of alternatives being considered with reasonable specificity. Otherwise, interested parties will not know what to comment on, and notice will not lead to better-informed agency decision-making." *Id.* The language of the final PRR Notice itself states in pertinent part:

> The proposed rule would have addressed these potential problems by revising section 13.3, the Scope of Regulations provision in part 13, to provide that the specific provisions in a particular [ITP] and associated documents would control whenever they were in conflict with the general provisions of the part 13 regulations. After further consideration, we have determined that it is more appropriate to address these potential conflicts by promulgating revisions to parts 13 and 17 that identify the specific instances in which the permit procedures for [ITPs] will differ from the general part 13 permit procedures.

64 Fed.Reg. 32,706, 32,706–07.

It is clear from this language that the course of action ultimately adopted was not proposed, nor even suggested, by the notice defendants rely on.

Indeed, the government itself has conceded that the June 1997 proposal did not include a proposal for the revocation provision which eventually became the PRR. Tr.

Hr'g 7/15/99 at 23 ("We did not specifically say in the June '97 proposed rule we plan to include this revocation provision."); Tr. Hr'g 6/13/03 at 59, 60.

■ When applying the "logical outgrowth" doctrine, the Court must determine whether the "purposes of notice and comment have been adequately served." *American Water Works Ass'n v. E.P.A.*, 40 F.3d 1266, 1274 (D.C.Cir.1994) ("We apply that standard functionally by asking whether 'the purposes of notice and comment have been adequately served,' that is, whether a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule.") (internal citation omitted).

The Court concludes that the 1997 Notice relied upon by defendants was insufficient as a matter of law to afford "exposure to diverse and public comment, fairness to affected parties, and an opportunity to develop evidence in the record." *Nat'l Min. Ass'n v. Mine Safety and Health Admin.*, 116 F.3d at 531 (internal quotations omitted).

### (b) *Post hoc* notice and comment

■ Defendants next argue that a February 2000 Federal Register notice, issued eight months after the final PRR and three months after plaintiffs amended their complaint, "seeking additional comment on a number of the regulatory changes finalized in the June 17, 1999 rule," cured any failure on their part to comply with the APA's notice and comment requirements. *See* 65 Fed.Reg. 6916 (Feb. 11, 2000); Def.'s Mem. at 38–39.

---

**9.** Plaintiffs also point to intragency communications describing the PRR as a "stealth rule," and stating that the "public did not understand that the proposed rule might allow significant, non-clarifying changes in the Part 13 regulations," as dispositive of this issue. *See* Second Supplement to Administrative Record, Privilege Index ("PI"), document 24 at 2.

In so doing, they rely on the Circuit's opinion in *Natural Resources Defense Council v. U.S. Nuclear Regulatory Comm'n*, 680 F.2d 810, 814–15 (D.C.Cir. 1982), in which the court found that, even if a rule was originally promulgated in violation of the APA's notice and comment requirements, following "repromulgation of the rule after providing notice and opportunity for comment," "we can hardly order the [agency] at this point to do something that it has already done." [10]

Defendants concede, however, that they did not repromulgate the PRR in this case, but rather left the rule in place and merely accepted comments on a rule already adopted. Tr. Hr'g 6/13/03 at 65, 67.

As a result, the D.C. Circuit's opinion in *State of New Jersey v. U.S. EPA*, 626 F.2d 1038 (D.C.Cir.1980), controls. In that case, the court held that

'defects in an original notice may be cured by an adequate later notice . . . but that curative effect depends on the agency's mind remaining open enough at the later stage.' The touchstone of our inquiry is thus the agency's open-mindedness, because the concern is that 'an agency is not likely to be receptive to suggested changes once the agency puts its credibility on the line in the form of final rules.' We therefore place the burden on the agency to make a compelling showing that the defects of its earlier notice were cured by the later one.

*Advocates for Highway and Auto Safety v. Federal Highway Admin.* 28 F.3d 1288, 1291–92 (D.C.Cir.1994) (internal citations omitted). The agency has wholly failed to make such a showing.

Defendants contend that they have complied with the requirements set forth in *Advocates for Highway and Auto Safety v. Federal Highway Admin.*, and that their

January 22, 2001 final PRR rulemaking demonstrates that FWS "carefully analyzed and responded to all comments." Defs.' Mot. at 39 n. 33.

Plaintiffs dispute this assertion, stating that defendants devoted only five paragraphs to responding to comments submitted in response to the February 2000 notice, and did not make any change to the PRR itself as a result of the "curative" rulemaking. Pls.' Reply at 36 n. 26. Certainly on this record, as in *State of New Jersey v. U.S. EPA*, there is "no evidence to rebut the presumption that post hoc comment was not contemplated by the APA and is generally not consonant with it." 626 F.2d at 1050.

Accordingly, the Court finds that Services' February 2000 public notice and comment proceeding was not sufficient to cure the Services' procedural violation of the APA.

■ Given that it appears clear that the PRR was adopted "without observance of the procedure required by law," 5 U.S.C. § 706(2)(D), the Court need not reach the question of whether the PRR is, as a substantive matter, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A). Rather, the appropriate remedy is to vacate the rule and remand it to the Services with instructions to truly begin anew the APA mandated notice and comment procedures, with the open mind required by the governing authorities. *See American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C.Cir.2001) (*vacatur* of an agency's order is normal remedy for APA violation).

It is clear on the record before the Court that the PRR is a substantive, rath-

---

**10.** Plaintiff distinguishes *NRDC* by noting that the Services did not engage in a whole new rulemaking process, but rather accepted "fur-

ther" comments on an already final rule. Pl.'s Reply at 35–36.

er than interpretive, rule and that, notwithstanding defendants' contention that a 1997 general rulemaking proposal sufficiently embraced the regulatory areas ultimately affected by the 1999 promulgation of the final PRR, the final PRR was issued without the notice and comment required by the APA, 5 U.S.C. § 553.

Moreover, the Services' *post hoc* notice and comment proceedings failed to cure this violation. Accordingly, *vacatur* of the PRR is required in order to vindicate the procedural rights conferred by the APA.

*Relationship between PRR and No Surprises Rule*

■ Having concluded that PRR promulgated during the pendency of this litigation should be set aside and remanded for public notice and comment, the Court further finds that the No Surprises Rule is sufficiently intertwined with the PRR that it must also be remanded to the agency for consideration as a whole with the PRR without further inquiry into its substantive validity.

Plaintiffs submit that "[s]ince defendants have expressly relied on the Revocation rule changes to defend the No Surprises rule ... the No Surprises rule must, at minimum, also be set aside and remanded, so that defendants can consider both of these interrelated regulatory actions at the same time, and provide the public with the input mandated by law." Pls.' Mot. At 35.

The defendants relied on the PRR in the course of a prior cross-motion for summary judgment in this case, stating that the PRR would amend ITP regulations to "clarify" that the Services may "revoke a[ ] permit for which there has been an unforeseen circumstance resulting in likely jeopardy to a covered species ...." Defs.' 4/23/99 Mem. in Supp. of Cross–Mot. for Summ. J. at 37.

In so doing, defendants effectively conceded that the PRR is relevant to the Court's review of the No Surprises Rule.

*See* Def.'s 6/15/99 Reply in Supp. of Mot. for Summ. J. at 11 ("the 1999 regulation[ ] is now a part of the implementing regulations for the ESA, and therefore must be considered by this Court in its review of plaintiffs' claims challenging the No Surprises Rule.").

Although defendants maintain that No Surprises Rule withstands plaintiffs' APA and ESA challenges without reference to the PRR, they further concede that remand of both rules to determine the impact of the PRR on the No Surprises rule is one course of action available to the Court. *See* Tr. Hr'g 7/15/99 at 21.

This Court has already preliminarily found, at least for purposes of ordering production of the administrative record, that the defendants are relying on the PRR to defend the No Surprises rule. *See* Tr. Hr'g 7/15/99 at 11, 20 ("So I think it's fair to say they are relying on it;" "Well, I would have to [take the PRR into account] because the government is relying on it."). Defendants have advanced neither argument nor evidence persuading the Court to revisit the issue. Accordingly, remand of the No Surprises Rule for consideration in tandem with the now-vacated PRR over the course of any new rulemaking procedures concerning revocation of ITPs No Surprises with No Surprises assurances is in order.

## VII. Conclusion

The history of the two regulatory provisions challenged in this action has indeed been full of surprises. The public has consistently been denied the opportunity, absent a court order, to be notified of substantive changes to regulations enforcing the ESA, and to weigh in on decisions likely to have significant effects on public resources.

First, the No Surprises Rule was announced as a "policy" without any prior notice or opportunity to comment on its

wisdom. It was only pursuant to a settlement agreement spurred by litigation and approved by Judge Sporkin of this Court that members of the public were finally afforded an opportunity to have their say with respect to the proposed policy.

Similarly, the Services promulgated the PRR during the pendency of this litigation without prior public notice or opportunity to provide meaningful comment, only to turn around and rely on the recently issued rule in their motion for summary judgment on plaintiffs' claims relating to the No Surprises Rule. "Section 553 of the APA is designed to ensure that affected parties have an opportunity to participate in and influence agency decision-making at an early stage," so as to have meaningful input into decisions which have an impact on their interests. *See State of New Jersey v. EPA*, 626 F.2d at 1049 (citation omitted).

Flagrant violations of the APA's notice and comment requirements such as those involved in the promulgation of the PRR can neither be countenanced nor cured by *post hoc* proceedings which merely go through the motions. *See id.*

Accordingly, the Court hereby **VACATES** and **REMANDS** the Permit Revocation Rule, 64 Fed.Reg. 32,712, 32,714 (Jun. 17, 1999), for further proceedings consistent with Section 553 of the APA.

Finally, with respect to the No Surprises Rule, defendants cannot have it both ways. They cannot, in one breath, cite to the PRR in its pleadings in support of summary judgment as evidence that the No Surprises Rule does not violate the ESA, and in the next contend that the No Surprises Rule can stand on its own without reference to the PRR such that judicial review of one without the other is appropriate. The Court therefore **REMANDS** the No Surprises Rule, 63 Fed.Reg. 8,859 (Feb. 23, 1998), for further consideration along with the Permit Revocation Rule.

Accordingly, upon careful consideration of the parties' cross-motions for summary judgment, the responses and replies thereto, the governing statutory and case law, and the entire record herein, for the reasons set forth in this Memorandum Opinion, it is by the Court hereby

**ORDERED** that defendants' motion for summary judgment [137–1] is hereby **DENIED**; and it is

**FURTHER ORDERED** that plaintiffs' motion for summary judgment [139–1] is hereby **GRANTED** as to Count III of the Complaint; and it is

**FURTHER ORDERED** that the Permit Revocation Rule, be and is hereby **VACATED**; and it is

**FURTHER ORDERED** that all administrative regulations challenged in this action are hereby **REMANDED** for global consideration by the Services in a manner consistent with this opinion.